# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TRISTRATA TECHNOLOGY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-496 (JJF) |
| | ) | |
| INTERNATIONAL SHIELD, INC., and | ) | |
| ABDEL ATTIA | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF TRISTRATA TECHNOLOGY, INC.'S
MOTION FOR SUMMARY JUDGMENT**

Dated: October 19, 2006

Arthur G. Connolly, III (# 2667)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

Of Counsel:
Michael O. Warnecke
Douglas L. Sawyer
Aric S. Jacover
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 701-8602

Kevin M. McGovern
Brian T. Foley
McGovern & Associates
545 Madison Avenue, 15th Floor
New York, New York 10022
(212) 688-9840

*Counsel for TriStrata Technology, Inc.*

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................. 2

III.   STANDARD OF REVIEW ................................................................................ 6

IV.   ARGUMENT ....................................................................................................... 7

       A.     Defendant International Shield is Liable Under the License Agreement, Forbearance Agreement and Extension to Forbearance Agreement ...................... 7

       B.     Defendant Attia is Liable Under the Personal Guaranty ..................................... 11

V.    CONCLUSION .................................................................................................... 12

i

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page**

*American General Corp. v. Continental Airlines Corp.*,
    622 A.2d 1 (Del. Ch. 1992) ......................................................... 8

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................ 6

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................ 6

*Edge of the Woods, L.P. v. Wilmington Savings Fund Society*,
    2001 WL 946521 (Del. Super. Aug. 16, 2001)..................................... 8, 9

*Elite Cleaning Co., Inc. v. Capel*,
    2006 WL 1565161 (Del. Ch. June 2, 2006) ...................................... 8

*Falco v. Alpha Affiliates, Inc.*,
    2000 WL 727116 (D. Del. Feb. 9, 2000) ....................................... 11

*Haft v. Dart Group Corp.*,
    877 F. Supp. 896 (D. Del. 1995)................................................. 8

*Horowitz v. Fed. Kemper Life Assurance Co.*,
    57 F.3d 300 (3d Cir. 1995) ..................................................... 6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................. 6

*McAllister v. Schettler*,
    521 A.2d 617 (Del. Ch., 1986) ............................................... 8, 9

*Pa. Coal Ass'n v. Babbitt*,
    63 F.3d 231 (3d Cir. 1995) ..................................................... 6

*Rudnitsky v. Rudnitsky*,
    2001 WL 1671149 (Del. Ch. Dec. 20, 2001)...................................... 9, 10

*U.S. for Use of Endicott Enterprises Inc. v. Star Brite Const. Co., Inc.*,
    848 F. Supp. 1161 (D. Del. 1994)................................................ 7


**STATUTES, REGULATIONS AND RULES**

Fed. R. Civ. P. 56.......................................................................... 1

Fed. R. Civ. P. 56(c) ...................................................................... 6

ii

Plaintiff, TriStrata Technology, Inc. ("TTI"), by its attorneys, pursuant to Fed. R. Civ. P. 56, respectfully submits its memorandum in support of its motion for summary judgment against International Shield, Inc. ("International Shield") and Abdel Attia.

## I.    **INTRODUCTION**

This is a simple case of breach of contract. In October 2005, TTI and International Shield entered into a comprehensive license agreement which settled a patent infringement action between the parties. The license agreement required International Shield to make specified royalty payments to TTI for past and future sales of the licensed products. The payment obligations were personally guaranteed by International Shield's president, Abdel Attia. Defendants failed to make the required payments under the license agreement. Over the course of several months, TTI agreed, at Defendants' request, to two successive forbearance agreements which extended International Shield's payment deadlines. Defendants failed to make their payments on each occasion. As a result of their multiple breaches, Defendants currently owe TTI over ███████████████████ TTI filed this lawsuit to recover the amounts owed under the license agreement and subsequent forbearance agreements. Defendants' breach is undisputed as they admit in their answer that they have "failed to satisfy all obligations under the agreements."

Defendants' answer frivolously claims that Mr. Attia, the signatory on each of the relevant agreements, acted under duress, was coerced and suffered a lack of mental capacity when he signed each of the four agreements at issue. These outrageous claims came as a shock to TTI, as there was no mention or indication of any such duress, coercion or incapacity throughout the entirety of the prior patent litigation (during which Mr. Attia was deposed for two days), the heavily negotiated settlement process, or the forbearance agreement negotiations. In fact, it was Mr. Attia's attorney who proposed and drafted the two forbearance agreements

1

extending the payment deadlines.  These unsubstantiated claims, which were raised for the first time in Defendants' answer, are utterly without merit and constitute a transparent last ditch effort by Defendants to avoid their payment obligations.  They certainly do not raise a genuine issue of material fact with respect to Defendants' liability under the agreements.

Accordingly, TTI respectfully submits that it is entitled to judgment as a matter of law. TTI's motion seeks collection of the due and owing balance under the agreements, plus interest, attorney's fees, and other such relief as specified therein.

## II.  **STATEMENT OF FACTS**

On October 15, 2005, TTI and International Shield entered into a license agreement which settled a patent infringement action brought by TTI concerning International Shield's sale of certain anti-aging skin products (the "License Agreement").  (*See generally* Ex. 1, License Agreement).[1]  International Shield was granted a license to sell certain products under TTI's patents, provided that it pay TTI for past and future sales of the licensed products. (*Id.*)

The payment provisions, which are set forth in Article 4 of the License Agreement, require International Shield to pay TTI ███████████████████████ (*Id.*, § 4.01(a)).
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████ (*Id.*)  International Shield was also required to pay running royalties on the licensed products with minimum annual royalties of ████████████████████████ commencing on April 1, 2006.  (*Id.*, § 4.01(b) and (c)).

Abdel Attia, the president and CEO of International Shield, signed the License Agreement on behalf of International Shield.  (*Id.*)  Mr. Attia also signed an "Affidavit of Sales"

---

[1] All exhibit numbers refer to the Appendix of Exhibits in Support of Plaintiff's Motion for Summary Judgment, attached herewith.

in support of the License Agreement stating that he is over eighteen years of age, is the chief executive officer of International Shield, and that he has reviewed both the accounting records for International Shield's products and payment provisions of the License Agreement. (*Id.*, Schedule 4.01(a)). ████████████████████████████████████

████ Mr. Attia executed a personal guaranty (the "Guaranty") in which he unconditionally guaranteed International Shield's payment obligations under the License Agreement and waived any and all guaranty defenses. (*See* Ex. 2, Guaranty, ¶¶ 1-3; Ex. 3, Declaration of Brian Foley ("Foley Decl."), ¶ 6). Mr. Attia also guaranteed any costs of collection, including attorney's fees. (Ex. 2, Guaranty, ¶ 1).

International Shield made one up front payment of ████████ when the License Agreement was signed, ██████████████████████████████████████ (*See* Ex. 3, Foley Decl., ¶ 7). However, on February 28, 2006, International Shield informed TTI that it would be unable to meet its further payment obligations ████████████████████ ████████████████████ (*Id.*, ¶ 8). Rather than be found in default, Defendants proposed a forbearance agreement. (*Id.*, ¶ 9). The forbearance agreement, dated March 1, 2006, provided that International Shield was to pay TTI on or before May 1, 2006 ██████████████████ ██████████████████████████████████████████████████ ████████████████ the "Forbearance Agreement"). (*See* Ex. 4, Forbearance Agreement, ¶ 1). These terms were proposed by Mr. Groth, legal counsel for International Shield and Mr. Attia. (*See* Ex. 3, Foley Decl., ¶ 10).

The first draft of the Forbearance Agreement was prepared by Mr. Groth and at no time did he indicate that Mr. Attia was suffering from duress, mental incapacity or was otherwise incapable of performing under the agreement. (*Id.*, ¶ 11). ████████████████████

3



(*Id.*)

(*Id.*)

(*Id.*, ¶ 12). International Shield, through Mr. Groth, asked for an additional 60 days to pay the amounts due, (*Id.*, ¶ 13). TTI agreed and the parties entered into an extension to the Forbearance Agreement, dated May 1, 2006, which required International Shield to pay all amounts due by June 29, 2006 (the "Extension to Forbearance Agreement"). (*See* Ex. 5, Extension to Forbearance Agreement, ¶¶ 1-2). As with the original Forbearance Agreement, Mr. Groth drafted the Extension to Forbearance Agreement and gave no indication that Mr. Attia was suffering from any duress or mental incapacity at the time. (*See* Ex. 3, Foley Decl., ¶ 15).

International Shield failed to make any of the required payments by the June 29, 2006 deadline. (*Id.*, ¶ 16). Brian Foley, TTI's outside counsel responsible for licensing, attempted to follow up with Mr. Attia's attorneys on numerous occasions, but received no response. (*Id.*, ¶ 17). Mr. Foley sent an e-mail to Mr. Groth on July 17, 2006, informing him that TTI had no other choice but to enforce its rights against International Shield and against Mr. Attia under the Personal Guaranty. (*Id.*) On July 21, 2006, Mr. Foley sent a letter to International Shield (addressed to Mr. Attia's attention) stating that the payment obligations had not been satisfied. Mr. Foley's letter further advised International Shield that it was no longer licensed under the agreements as a result of its default. (*Id.*, ¶ 18).

On August 10, 2006, after receiving no response from Defendants to Mr. Foley's repeated inquiries, TTI filed this lawsuit seeking payment from International Shield and/or Mr. Attia of all due and owing amounts plus interest, costs and attorney's fees. TTI withheld formal service but sent courtesy copies to Defendants' counsel via e-mail on August 11, 2006. (*Id.*, ¶ 19). At Defendants' request, TTI agreed to an extension of time for Defendants to file their answer. (*Id.*) Defendants' answer was filed on September 27, 2006. In their answer, Defendants admit they failed to satisfy all their payment obligations, but allege, for the first time, that each of the four agreements signed by Mr. Attia are unenforceable because they were "signed by Defendant(s) while under improper duress and/or coercion and because Defendant Attia suffered a lack of mental capacity to execute" the referenced agreements. (*See* Defendants' Answer [D.I. 9], ¶¶ 7, 9, 11-13, 17-18, 25).

At no time during the negotiation or performance of the relevant agreements did Mr. Attia (or his attorneys) indicate to TTI (or its attorneys) that he was under duress, lacked the mental capacity or was otherwise incapable of entering into or performing under the agreements. (*See* Ex. 3, Foley Decl., ¶ 20). ████████████████████████████████ ███████████████████ (*See generally* Ex. 1, License Agreement, Schedule 4.01(a)). He participated, on behalf of his company, in litigation with TTI for over a year and sat for a two-day deposition conducted by TTI's lawyers. Mr. Foley, who was present at the entire deposition, recalls no instance when Mr. Attia appeared to be suffering from any duress or mental incapacity (and the transcript reveals none either). (*See* Ex. 3, Foley Decl., ¶ 22).

Mr. Attia signed a total of five separate documents over the course of seven months: the License Agreement, the Affidavit of Sales, the Personal Guaranty and the two forbearance agreements. The two forbearance agreements were proposed and drafted by his attorneys. The

others were heavily negotiated by his attorneys and signed by Mr. Attia. Defendants now claim, for the first time, that each of those documents are invalid and unenforceable.

To date, apart from International Shield's initial payment of ██████ none of the remaining amounts have been paid by Defendants under the License Agreement and subsequent forbearance agreements. (*Id.*, ¶ 23).

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir. 1995) (internal citations omitted). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

For the reasons that follow, summary judgment should be granted in favor of TTI on Counts I and II of the Complaint.

IV.    **ARGUMENT**

    A.    **Defendant International Shield is Liable Under the License Agreement, Forbearance Agreement and Extension to Forbearance Agreement**

Under Section 4.01 of the License Agreement, International Shield was required to make payments to TTI for past and future sales of the licensed products. Other than the modest initial payment of ████ for past sales, International Shield has defaulted on all of its remaining payment obligations under the License Agreement, Forbearance Agreement and Extension to Forbearance Agreement. In particular, International Shield has failed to make the following payments: (1) ██████████████████████████████ pursuant to Section 4.01(a) of the License Agreement; (2) ████████████████████████ ██████████████████████████████████████ ████, pursuant to Sections 4.01(b) and (c) of the License Agreement; (3) ████████████ ██████████████ pursuant to Paragraph 1 of the Forbearance Agreement; and (4) ████████ ████████████████████████████████, pursuant to Paragraph 2 of the Extension to Forbearance Agreement. (*See* Ex. 3, Foley Decl., ¶¶ 7-8, 12, 16, 23). There is no genuine issue of material fact on the issue of International Shield's payment obligations as International Shield has already admitted in its answer that it failed to satisfy *all* of its obligations under these agreements. (*See* Defendants' Answer [D.I. 9], ¶ 17-18).

The License Agreement, Forbearance Agreement and Extension to the Forbearance Agreement are legally enforceable contracts signed by and between TTI and International Shield. International Shield has breached the foregoing agreements by failing to tender payments as provided therein. *See U.S. for Use of Endicott Enterprises Inc. v. Star Brite Const. Co., Inc.*, 848

F. Supp. 1161, 1169 (D. Del. 1994) (failure to make payments required by contract constitutes material breach); *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *6 (Del. Ch. June 2, 2006) (same) (attached as "Exhibit A" hereto). TTI, on the other hand, has fully performed all of its obligations under the relevant agreements and promptly demanded payment on several occasions (even though formal demand was not required). (*See* Ex. 3, Foley Decl., ¶¶ 17-19). Mr. Foley notified International Shield of the outstanding payments in his letter of July 21, 2006 and also provided notice of default pursuant to which TTI properly terminated International Shield's license under Sections 7.01 and 13.01 of the License Agreement. (*See id.*; Ex. 1, License Agreement §§ 7.01, 13.01).

It is well-settled that where one contracting party has fully performed and the other party has breached a material provision, the non-breaching party is entitled to contract damages. *See Haft v. Dart Group Corp.*, 877 F. Supp. 896, 901-2 (D. Del. 1995); *American General Corp. v. Continental Airlines Corp.*, 622 A.2d 1, 8 (Del. Ch. 1992). TTI is entitled to collect the entire unpaid balance due under the License Agreement and subsequent forbearance agreements. In the event TTI prevails in this action, TTI is also entitled to collect attorney's fees and costs pursuant to the prevailing party clause in Section 14.03 of the License Agreement, which states: "In any action commenced to enforce this Agreement or as a result of a breach of this Agreement, the prevailing party in such action shall be entitled to recover the cost of such action, including attorney's fees, incurred as a result of the action to enforce and/or remedy the breach of this Agreement." (Ex. 1, License Agreement § 14.03).

International Shield's allegations of duress, coercion and mental incapacity are entirely unfounded and therefore present no genuine issue of material fact. Defendants bear the burden of proof on this issue. *See Edge of the Woods, L.P. v. Wilmington Savings Fund Society*, 2001

8

WL 946521, at *4 (Del. Super. Aug. 16, 2001) (attached as "Exhibit B" hereto); *McAllister v. Schettler*, 521 A.2d 617, 621 (Del. Ch., 1986) ("Adults are presumed to have contractual capacity and the burden of proving otherwise rests with the party alleging incapacity."). A contract is voidable due to duress or coercion only if there is "(1) a wrongful act which (2) overcomes the free will of the person (3) who has no adequate legal remedy to protect his interests." (*Id.*) Similarly, the standard for voiding a contract for mental incapacity requires proof that Mr. Attia was "incapable of understanding the nature and effect of the transaction or [his] mental faculties were so impaired as to render [him] unable to properly, intelligently and fairly protect and preserve [his] property rights." *McAllister*, 521 A.2d at 621. This requires more than mere uncorroborated, self-serving testimony. *See Rudnitsky v. Rudnitsky*, 2001 WL 1671149 at *4 (Del. Ch. Dec. 20, 2001) (attached as "Exhibit C" hereto).

Mr. Attia cannot come close to meeting these standards. TTI did not threaten Defendants or commit any "wrongful acts" that would constitute duress or coercion. To the contrary, TTI went out of its way to accommodate Defendants by ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, and then agreeing to successive forbearance agreements extending the payment deadlines. (*See* Ex. 3, Foley Decl., ¶¶ 8-10, 12-14; Ex. 4, Forbearance Agreement; Ex. 5, Extension to Forbearance Agreement). TTI even delayed formal service of the complaint to allow Defendants additional time to settle the amounts due. (*See* Ex. 3, Foley Decl., ¶ 19). Moreover, Defendants were represented by competent counsel at every turn, and it was Mr. Attia's attorney who proposed and drafted the two forbearance agreements that Defendants now claim are unenforceable due to duress and coercion. (*Id.*, ¶¶ 10-11, 15). *See Edge of the Woods*, 2001 WL 946521, at *6 (party's interests were protected where it was represented by counsel). There is simply no

9

evidence to suggest that any of the four agreements signed by Mr. Attia were the product of duress or coercion.

Even if there were such evidence, the agreements were legally ratified by Defendants because they continued to accept the benefits and operate under the License Agreement up and until it was terminated by TTI on July 21, 2006. In particular, Defendants continued to sell products covered by TTI's patents, paid the first installment for past sales, and negotiated forbearance agreements to extend their payment deadlines, among other things. *See Rudnitsky*, 2001 WL 1671149 at *6 ("[r]atification results if the party who executed the contract under duress accepts the benefits flowing from it for any considerable length of time after opportunity is afforded to annul or void it."). In fact, Defendants are still offering the licensed products for sale on its website even though the license was terminated by TTI several months ago. (*See* Ex. 6, Declaration of Molly Sherlock, ¶ 3).

Mr. Attia's claim that he was suffering from mental incapacity at the signing of each of the four agreements is even harder to believe. During the prior litigation, Mr. Attia sat for a two-day deposition where he answered questions cogently and displayed no indication that his mental faculties were impaired. (*See* Ex. 3, Foley Decl., ¶ 22). In fact, during a break in the deposition, Mr. Attia asked TTI's counsel if the case could be settled. (*Id.*) Soon thereafter, the case did settle and the License Agreement was signed, along with the Guaranty. With respect to the License Agreement, TTI took additional steps to ensure that Mr. Attia understood his payment obligations by having him sign an Affidavit of Sales stating that he reviewed both International Shield's accounting records and the payment terms of the agreement. (*See* Ex. 1, License Agreement, Schedule 4.01(a)).

10

Put simply, at no time during the settlement of the prior litigation, or the seven months following the execution of the License Agreement, did Mr. Attia or his attorneys indicate that he was suffering from any sort of duress or mental condition that would prevent him from entering into and performing under the agreements. (*See* Ex. 3, Foley Decl., ¶ 20). The fact is, the only thing preventing Defendants from performing was their inability to make timely payments. There is no genuine issue of material fact with respect to International Shield's liability under the License Agreement and subsequent forbearance agreements. Accordingly, TTI is entitled to judgment as a matter of law as to Count I of TTI's Complaint.

**B.      Defendant Attia is Liable Under the Personal Guaranty**

As additional consideration to TTI, Mr. Attia executed a personal guaranty. Under its terms, Mr. Attia guaranteed "absolutely and unconditionally the prompt and complete payment to [TTI] the payments required by Section 4.01(a) of the License Agreement and also guarantee[d] any costs of collection thereof including but not limited to all attorney fees and legal costs." (Ex. 2, Guaranty, ¶ 1). The Guaranty also provides that it shall remain in effect "until all of the obligations of International Shield pursuant to Section 4.01(a) of the License Agreement are satisfied." (*Id.*, ¶ 2).

The extent of a guarantor's liability is determined by the terms of his or her contract. *See Falco v. Alpha Affiliates, Inc.*, 2000 WL 727116, at *8 (D. Del. Feb. 9, 2000) ("Guaranty obligations are interpreted according to the same standards as general contracts."). Mr. Attia has breached the guaranty because he has failed to submit payments as provided therein. As with the other contracts, Mr. Attia admitted in his answer that he failed to satisfy his payment obligations under the Guaranty. (*See* Defendants' Answer [D.I. 9], ¶ 25). TTI is thus entitled to collect from Mr. Attia the entire unpaid balance due under Section 4.01(a) of the License Agreement and subsequent forbearance agreements, plus attorney's fees and costs.

11

For the same reasons discussed in Section IV.A. above, Mr. Attia's claim that the Guaranty is unenforceable because it was signed under duress, coercion or mental incapacity are without merit and do not present a genuine issue of material fact. Accordingly, TTI is entitled to judgment as a matter of law with respect to Count II of TTI's Complaint.

## V.     CONCLUSION

For all of the foregoing reasons, TTI is entitled to judgment in its favor and against Defendants International Shield and Abdel Attia as a matter of law.

Dated:  October 19, 2006                     Respectfully submitted,

Arthur G. Connolly, III (# 2667)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

Of Counsel:
Michael O. Warnecke
Douglas L. Sawyer
Aric S. Jacover
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 701-8602

Kevin M. McGovern
Brian T. Foley
McGovern & Associates
545 Madison Avenue, 15th Floor
New York, NY 10022
(212) 688-9840

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 26, 2006, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF which will send notification of such filing

to the following counsel of record:

Michael W. Modica, Esq.
715 King Street, Suite 300
P.O. Box 437
Wilmington, DE 19899


                     /s/Arthur G. Connolly, III
                     Arthur G. Connolly, III (#2667)

#494733_1

# EXHIBIT A

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 946521 (Del.Super.)
(Cite as: Not Reported in A.2d)

**H**
Edge of the Woods v. Wilmington Savings Fund Society, FSBDel.Super.,2001.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
EDGE OF THE WOODS, Limited Partnership, a Delaware limited partnership, Edge of the Woods, Inc., a Delaware corporation, Water's Edge Marketing Corporation, a Delaware corporation, and Pencader Development Company, a Delaware corporation,
Plaintiffs,
v.
WILMINGTON SAVINGS FUND SOCIETY, FSB, a federal savings bank, Defendant.
**No. CIV.A.97C-09-281-JEB.**

Submitted: June 15, 2001.
Decided: Aug. 16, 2001.

On Defendant's Motion for Summary Judgment-Granted.-On Defendant's Counterclaim-Granted.

Joseph Scott Shannon, Esquire, Wilmington, for Plaintiffs.
Thomas P. Preston, Esquire, Wilmington, for Defendant.

OPINION
BABIARZ, J.
**\*1** This case involves alleged breaches of loan agreements arising out of years of commercial loan transactions and dealings between the Plaintiffs and the Defendant. Plaintiffs allege seven causes of action. Defendant moves for summary judgment on all claims, arguing that the Plaintiffs signed releases governing the all of the loans at issue and that the releases serve to relieve Defendant of all liability. Because the releases executed by the Plaintiffs are valid and binding, and there is no evidence of economic duress to render the

releases voidable, Defendant's motion for summary judgment is GRANTED. Because Plaintiffs breached their contractual obligations not to sue, Defendant's motion for summary judgment on its counterclaim is also GRANTED.

I. FACTS

Plaintiff Edge of the Woods Limited Partnership ("EWLP") was formed for the purpose of constructing a condominium development in New Castle County, Delaware called "Water's Edge" (hereinafter "the project"). Plaintiffs Edge of the Woods, Inc. ("EWI"), Water's Edge Marketing Company ("WMECO"), and Pencader Development Company ("PDC") are all general partners of EWLP (hereinafter collectively referred to as "Plaintiffs"). Defendant Wilmington Savings Fund Society ("WSFS") is a savings bank.

In 1987, the parties began negotiating the financing of the project. In October 1987, WSFS sent a proposal letter to the Plaintiffs for an $11 million construction loan with a term of 18 months, to be followed by a five year permanent loan, subject to EWLP's fulfillment of certain conditions. On March 8, 1988, WSFS issued a commitment letter that reiterated the terms of the proposal.

On August 5, 1988, EWLP secured a line of credit from WSFS for approximately $11 million (the "Loan") to fund the project. This original loan agreement was written to cover 264 rental units that were to be sold as condominiums (an amount later reduced to 220 units and 44 lots). A "Building Loan Agreement" also provided that the construction term of the loan would mature on January 31, 1990, on which day all construction work would be finished, and that an independent appraisal would be performed on the completed Project. The Plaintiffs believed that the construction would be completed in 18 months and Plaintiffs understood WSFS to believe the same.[FN1]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 2
Not Reported in A.2d, 2001 WL 946521 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

<u>FN1.</u> *See* Def. Mot. for Summ. J., App. I, Ex. 24, Dep. of Hugh Martin at 61-62

On January 31, 1990, with construction incomplete and unable to repay the loan, EWLP requested an extension of the construction loan term and an increase in credit from WSFS. On July 23, 1990, the parties agreed to an amendment of the original agreement that: increased the principal amount by $500,000; extended the construction term for twelve months to February 5, 1991, with no change in the interest rate; and gave EWLP the unilateral right to extend this amendment for another six months (which EWLP subsequently did).

On August 5, 1991, with construction incomplete and still unable to repay the loan, EWLP requested a second extension of the construction loan term and additional time to repay the funds from WSFS. On August 22, 1991, the parties agreed to a second amendment of the original agreement and first amendment that: extended the construction term for twelve months to February 5, 1992, with no change in the interest rate; required EWLP to satisfy an average unit sales minimum; and included a general release in which EWLP promised not to sue WSFS on any claims relating to the loan.

**\*2** On February 5, 1992, with construction incomplete, still unable to repay the loan, and having failed to accomplish the unit sales minimum, EWLP requested a third extension of the construction loan term and additional time to repay the funds from WSFS. On March 23, 1992, the parties agreed to a third amendment that: extended the construction term for two years; reduced the number of units from 264 to 220 with no reduction in the available loan proceeds; established a $230,000 interest reserve; established an excess sales proceeds account where surplus proceeds from unit sales could fund certain cost overruns up to $236,000; reduced the average unit sales minimum; removed Plaintiff WMECO as the project's marketing arm; and included a general release in which EWLP promised not to sue WSFS on any claims relating to the loan.

On March 31, 1994, with construction incomplete, still unable to repay the loan, and again having failed to accomplish the unit sales minimum, EWLP requested a

fourth extension of the construction loan term from WSFS in order to finish the remaining project units, which was essential to converting the construction loan to permanent financing. On June 7, 1994 (but effective as of March 31, 1994), the parties agreed to a fourth amendment that: extended the construction term to September 1, 1994 to allow the project's completion and the parties' negotiation of a permanent loan; reduced the minimum interest reserve from $230,000 to $90,000; and included a general release in which EWLP promised not to sue WSFS on any claims relating to the loan.

In June 1994, construction was completed and certificates of occupancy were issued for all 220 units. Also in June 1994, the 77 unsold project units were appraised at $4,335,000. This amount was used to assess the value of the property being offered as security on the "Mini-Perm" loan.

On September 30, 1994, the parties agreed on a "Mini-Perm" loan that essentially converted the construction term loan to a permanent loan. The "Mini-Perm" contained an interest rate of 2 1/2 % over the floating prime rate for a 20-year amortization period and included the personal guarantees of Hugh Martin, V ("Martin"), and David N. Levinson ("Levinson", and together the "Guarantors") the two presidents of EWI, WEMCO and PDC. The mortgage was secured by 65 unsold project units.

In February 1997, EWLP paid $779,855.83 in full satisfaction of all sums due WSFS.

On September 30, 1997, Plaintiffs commenced this action.

Plaintiffs allege that WSFS knowingly underfunded the 264 units that WSFS agreed to finance, at the inception of and continuing throughout the duration of the project. Plaintiffs allege that WSFS forced real estate appraisers to underrate the value of the units, resulting in an undercapitalization of the Project. Plaintiffs allege that this financial short-changing by WSFS resulted in "business duress" for the Plaintiffs.

Plaintiffs allege that WSFS misrepresented the loan

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 946521 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 3

terms and forced EWLP to accept inferior terms than those that were previously discussed.

**\*3** Plaintiffs allege that WSFS required EWLP to sign releases of lender liability claims as a condition of rolling over the line of credit, and threatened default and lawsuits without intending to act on them.

Plaintiffs allege that in 1993 WSFS pressured EWLP into slowing its construction schedule, and then threatened default on the loan when EWLP did slow down, without intending to act on the threat.

Plaintiffs allege that WSFS disregarded its own credit policy, both by ignoring the WSFS policy that generally "construction loans for residential purposes" are considered "desirable loans" by WSFS, and by treating EWLP as a "problem loan", when in fact any perceived problems were solely the creation of WSFS.

Plaintiffs allege that WSFS unreasonably increased security at EWLP's expense by establishing an interest reserve account for deposits of all rental proceeds and an excess sales proceeds account that constituted a "seizure" of proceeds. These unreasonable security measures, argues EWLP, resulted in impairment of EWLP's cash flow "with the effect of bleeding EOTW white and draining all of the profit and while crippling EWLP's ability to finance and timely complete construction." [FN2]

> FN2. *See* Pls. Ans. Br. in Opp'n to Def. Mot. for Summ. J. at 18.

Plaintiffs allege that WSFS imposed punitive interest rate increases on EWLP. Plaintiffs allege that WSFS required EWLP to change its marketing broker to a third-party realtor, causing a further loss of revenue. Plaintiffs allege that WSFS employed a "schizophrenic approach" in tying unit sales to disbursement of loan proceeds.

Plaintiffs allege that WSFS employed negotiation tactics that were more "dictation" than bargaining.

Plaintiffs allege that WSFS used inconsistent asset risk

classification and subjective ratings of the EWLP loans, including reviews of the loan performance and the Plaintiffs' management of the project.

Plaintiffs allege that WSFS gave unnecessary scrutiny and management to the loan as a result of "WSFS's own plummeting financial circumstances." [FN3] As a result, Plaintiffs argue, WSFS sought ways to generate additional revenue, including squeezing monies from borrowers like the Plaintiffs, who had effectively become "prisoner[s] of the bank." [FN4]

> FN3. *Id.* at 37.

> FN4. *Id.* at 38.

Plaintiffs have asserted from the above allegations the following counts in their Amended Complaint:

(1) breach of contract by WSFS for alleged violations of the loan agreement;

(2) breach of the implied covenants of good faith and fair dealing by WSFS under the Delaware Uniform Commercial Code, 8 *Del. C.* § 1-203;

(3) tortious interference by WSFS with the contracts between EWLP and its contractors;

(4) fraudulent conduct by WSFS, as detailed in the above allegations;

(5) breach of fiduciary duty by WSFS;

(6) violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq., ("RICO") by WSFS's conspiracy to extort and defraud EWLP in "a pattern of racketeering activity"; and

(7) violations of 5 *Del. C.* § 929 ("Regulations Governing Business of Banks and Trust Companies: Tying arrangements prohibited") by WSFS in using its position as lender to improperly influence EWLP's decisions concerning the marketing and refinancing of the project.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 2001 WL 946521 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**\*4** In response, Defendant argues in its motion for summary judgment that the three releases executed by EWLP serve to insulate WSFS from all claims stemming from the loans. Defendant argues that the Plaintiffs have failed, as a matter of law, to sufficiently plead duress to render the releases unenforceable. Defendant has also filed a counterclaim for breach of contract, arguing that EWLP sued WSFS when EWLP expressly covenanted not to do so in the three separate releases.

## II. STANDARD OF REVIEW

The Court may grant summary judgment if it concludes that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." [FN5] The moving party bears the initial burden of showing that no material issues of fact are present. [FN6] Once such a showing is made, the burden shifts to the nonmoving party to demonstrate that there are material issues of fact in dispute. [FN7] In considering a motion for summary judgment, the Court must view the record in a light most favorable to the nonmoving party. [FN8] The Court's decision must be based solely on the record presented and not on all evidence "potentially possible." [FN9]

> FN5. *Super. Ct. Civ. R. 56(c)*; *Burkhart v. Davies*, Del.Supr., 602 A.2d 56, 59 (1991).

> FN6. *Moore v. Sizemore*, Del.Supr., 405 A.2d 679, 680 (1979).

> FN7. *Id.* at 681.

> FN8. *Burkhart*, 602 A.2d at 59.

> FN9. *Rochester v. Katalan*, Del.Supr., 320 A.2d 704, 708 (1974) (citing *United States v. Article Consisting of 36 Boxes*, D. Del., 284 F.Supp. 107 (1968), aff'd, 415 F.2d 369 (3d Cir.1969)).

## III. DISCUSSION

### A. PLAINTIFFS' BREACH OF FIDUCIARY DUTY, FRAUD, RICO, AND *5 DEL. C.* § 929 CLAIMS

As a preliminary matter, Plaintiffs "mak[e] no answer to WSFS's requests for summary judgment as to Count 4, 'Fraud'; Count 6, 'Violations of RICO'; nor Count 7, 'Violation of *5 Del. C.* § 929* [improper tying]." As such, summary judgment is granted on these claims. Regardless, because of the releases signed by Plaintiffs, these three claims would be subject to dismissal by summary judgment, as discussed below. Plaintiffs' Breach of Fiduciary Duty claim, Count Five, is also subject to dismissal by summary judgment as a claim made pursuant to the valid releases, as outlined below.

### B. ECONOMIC DURESS AND THE PARTIES' RELEASES

The issue in this case is whether or not there is a genuine issue of material fact as to the enforceability of the releases [FN10]; specifically: Is there evidence of economic duress to render the releases voidable? The court answers both questions in the negative.

> FN10. The release in the Third Amendment to Building Loan Agreement states:
> "Borrower hereby remises, releases and forever discharges Lender, its agents, officers, servants, employees, successors and assigns (collectively the "Released Parties"), of and from any and all manners of action, causes of action, suits, debts, dues, agreements, obligations, liabilities, claims, accounts, and/or demands whatsoever, whether at law or in equity, or any other claims Borrower may have or could have against the Released Parties, known or unknown, which the Borrower now has, can have, ever had, or which their successors or assigns or any of them hereafter can, shall or may have arising out of or relating to the Project, the Loan and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2001 WL 946521 (Del.Super.)
(Cite as: Not Reported in A.2d)

this Agreement, including, by way of illustration and not of limitation, any of the foregoing which relates in any way to the allocation, budgeting, and disbursement of the Loan proceeds during the period from August 22, 1991 through and including the date hereof."

The release in the Fourth Amendment to Note, Mortgage, and Guarantys [sic] states:

"Obligor and Guarantors hereby expressly release Obligee from liability for any claims, defenses, causes of action, damages, losses, whether known or unknown, now or previously existing, with respect to the loan, the Loan Documents, the Guarantors or any acts or omissions to act of Obligee related to or arising out of the loan, Loan Documents, Guarantys [sic] or this Amendment."

General releases are valid and enforceable in Delaware.[FN11] The party seeking to nullify a release bears the burden of proving by clear and convincing evidence that the release is invalid.[FN12] Where the release is clear and unambiguous and supported by consideration, it only will be set aside where there is fraud, duress, coercion, or mutual mistake concerning the existence of a party's injuries.[FN13] In Delaware, duress can render a contract voidable where there is a (1) a wrongful act which (2) overcomes the free will of the person (3) who has no adequate legal remedy to protect his interests.[FN14] Economic duress is duress directed against a person's business interests, and is often referred to as "business compulsion."[FN15]

FN11. *See Sabatoro Constr. Co., Inc. v. Formosa Plastics Corp.,* Del.Super., C.A. No. 92L-08-030-SCD, 1996 WL 453460, at *3, Herlihy, J. (June 10, 1996) (clear and unambiguous language in the release should be given its ordinary and usual meaning); *Fox v. Christiana Square Assoc.,* Del.Super., C.A. No. 91L-04-61-MT, 1994 Del.Super. LEXIS 141, Alford, J. (April 5, 1994) (release is final and binding where there is a meeting of the minds, consideration, and no fraud, misrepresentation, mistake, duress or undue influence); *Egan and Sons Air Conditioning Co. v. General Motors Corp.,* Del.Super., C.A. No. 86L-MY-18, 1988 Del.Super. LEXIS 166, Gebelein, J. (April 27, 1988) (same).

FN12. *Hob Tea Room v. Miller,* Del.Supr., 89 A.2d 851, 856, Tunnell, J. (1952) ("As we view it, however, it was the plaintiff's burden to prove, by evidence 'in every respect clear and convincing, and free from doubt,' that the actual agreement of the parties was that the release should not be the general one it purports to be.") (citing *Colvocoresses v. W.S. Wasserman Co.,* Del. Ch., 4 A.2d 800, 803 (1942)).

FN13. *Id.*

FN14. *E.I. Du Pont de Nemours and Co. v. Custom Blending International Inc.,* Del. Ch., C.A. No. 16295-NC, 1998 WL 842289, at *4, Strine, V.C. (Nov. 24, 1998); *Cianci v. Jem Enterprise, Inc .,* Del. Ch., C.A. 16419-NC, 2000 WL 1234647, at *9, Lamb, V.C. (Aug. 22, 2000); *Way Road Development Co. v. Snavely,* Del.Super., C.A. No. 89C-DE-48, 1992 WL 19969, at *3, Toliver, J. (January 31, 1992).

FN15. *Hanna Sys., Inc. v. Capano Group, L.P.,* Del. Ch., C.A. No. 7408, 1985 WL 21128, at *3, Walsh, J. (Nov. 29, 1985) (citing *Fowler v. Mumford,* Del.Super., 102 A.2d 535 (1954)).

### 1. DURESS-WRONGFUL ACTS

*5 In the defense of duress, the actions complained of must be wrongful, but not necessarily unlawful.[FN16] In claiming economic duress, one must be deprived of the free exercise of his will through wrongful threats or acts directly against a person's business interest.[FN17] Generally, the threat to exercise a legal or contractual right that the maker of the threat clearly holds is not, in and of itself, improper.[FN18] Threats of litigation are likewise typically permissible so long as the threat was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                     Page 6
Not Reported in A.2d, 2001 WL 946521 (Del.Super.)
(Cite as: Not Reported in A.2d)

done with a good faith belief that a viable cause of action existed.[FN19]

    FN16. *Fowler* at 538.

    FN17. *R.M. Williams Co. v. Frabizzio,* Del. Ch., C.A. No. 9834, 1990 WL 18399, at *4, fn 3, Chandler, V.C. (Feb. 22, 1990) (Mem.Op.) (*citing Fowler* ).

    FN18. *Cianci* at *9.

    FN19. *Way Road,* at *4; *E.I. Du Pont de Nemours* at *4.

In this case, Plaintiffs argue that the releases are not binding because they were procured under duress consisting of wrongful actions by WSFS, including: threats of foreclosure and default; threats against Levinson's personal interests; WSFS's insistence upon certain loan conditions; assigning eight different loan officers to the project; linking the disbursement of funds to unit sales; requiring WMECO to subcontract the marketing to a third party; unreasonably denying EWLP the cash flow from the unit sales and rentals; and requiring EWLP to sign releases.

In response, Defendant argues that the actions complained of by Plaintiffs do not constitute "wrongful acts" under economic duress analysis. Defendant argues that any "threats" were only warnings of WSFS's intentions to exercise legal or contractual rights, and any such "threats" were made with a good faith belief in the validity of WSFS's rights.

I find that the "threats" and related activity attributed to the Defendant consist of nothing more than hard-bargaining business tactics, lawful attempts to force EWLP to comply with its loan obligations, and the aggressive protection of WSFS's financial interests. WSFS's insistence on certain conditions such as the execution of releases or the use of a certain marketing body by EWLP are merely terms that WSFS rightfully elected to insist upon during the bargaining process.[FN20] "Mere hard bargaining is insufficient to constitute duress, even when one of the parties is in financial

difficulty." [FN21] Claims of economic duress based on such a record of threats of contractual and legal rights are not sustainable.[FN22]

    FN20. *Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.,* D.Del., 769 F.Supp. 671, 738 (1991) ("In every contract negotiation there is an implied threat that the party will not perform unless his terms are accepted. This type of implied threat is a necessary part of the bargaining process.")

    FN21. *Id.*

    FN22. *E.I. Du Pont de Nemours* at *4.

### 2. DURESS-DESTRUCTION OF FREE WILL

The word "threat" does not equal "duress." [FN23] The party seeking to nullify an otherwise valid release must show that he was compelled to accept the demands for a release through improper threats that "destroyed [his] free will." [FN24]

    FN23. *Coca-Cola Bottling Co.* at 739.

    FN24. *Vassallo v. Haber Electric Co.,* Del.Super., 435 A.2d 1046, 1050 (1981).

In this case, Plaintiffs argue that WSFS's tactics to "wring concessions" and "force Draconian loan terms and conditions" on the Plaintiffs were sufficient to break the free will of David Levinson, who testified as to the personal emotional toll he suffered.

In response, Defendant argues that any economic duress felt by the Plaintiffs was the result of poor outside economic conditions, not by any conduct of WSFS. Defendants further argues that EWLP was a sophisticated commercial borrower who had the availability of legal counsel.

*6 I find that Plaintiffs were not forced to execute the releases because their free will was somehow destroyed by WSFS. Parties are generally held to an agreement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 7
Not Reported in A.2d, 2001 WL 946521 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

even though one may have taken advantage of another's adversity, as long as the contract has been shaped by prevailing market forces.[FN25] Plaintiffs admit that the "general economic conditions affected the alternative financing available to EWLP"[FN26], yet in the same breath reiterate *ipse dixit* statements that only WSFS is to blame for EWLP's economic troubles. As the Court in *Cianci* put it:

> FN25. *See Cianci* at *10 (*quoting* Restatement (Second) of Contracts, § 176 cmt. f, 486); *Coca-Cola Bottling Co.* at 739 (*quoting* E. Farnsworth, *Farnsworth on Contracts* § 4.17 at 437-38 (1990)).

> FN26. *See* Pls. Ans. Br. in Opp'n to Def. Mot. for Summ. J. at 55.

No breaking of the will should be found where outside forces independent of and not created by the maker of the threat compel the contract's immediate acceptance, and the victim otherwise could have walked away and considered the terms more deliberately.[FN27]

> FN27. *Cianci* at *10.

Here, the admittedly poor market conditions for obtaining financing for commercial construction projects in the early 1990's should not fall on the shoulders of WSFS.

Further, EWLP was a sophisticated commercial borrower when it negotiated the loan terms. The Guarantors and heads of EWLP, Mr. Levinson and Mr. Martin, were hardly commercially unsophisticated, and in fact both had extensive experience in the real estate development business, both as builders and borrowers.[FN28]

> FN28. *See Sabatoro Constr. Co.* at *4 (denying a duress claim and noting that plaintiff was commercially sophisticated party); *E.I. Du Pont de Nemours* at *4 (ruling that defendant's economic duress claim failed

as a matter of law in part because defendant was a "sophisticated commercial party").

Finally, EWLP at all times had available to it legal advice such that its free will was reasonably and vigorously protected. In Delaware, "the availability of disinterested advice" is a consideration in analyzing whether a threat broke the will and caused the assent of the aggrieved party.[FN29] In this case, Mr. Levinson and Mr. Martin were represented by competent counsel at every turn, and both men discussed each of the three releases during each of the negotiation proceedings for the Second, Third, and Fourth Amendments.

> FN29. *Cianci* at *10.

### 3. DURESS-NO ADEQUATE LEGAL REMEDY AVAILABLE

In economic duress analysis, "[t]he third prong focuses on whether the coercive conduct creates or takes advantage of an exigent circumstance such that the victim could not reasonably be expected to resist and seek legal relief to protect his interests." [FN30] Further, "[a] threat, even if improper, does not amount to duress if the victim has a reasonable alternative to succumbing and fails to take advantage of it." [FN31]

> FN30. *Cianci* at *9.

> FN31. *Id.* (*citing* Restatements (Second) of Contracts, § 175, cmt. b. (1981)).

Because I have already concluded that the releases are not voidable due to economic duress, it is unnecessary to for me to consider the question of whether Plaintiffs' claim satisfies the last element of the defense of duress.[FN32]

> FN32. *Cianci* at *11.

The Court finds, as a matter of law, economic duress was not employed here. Accordingly, the Court must award judgment as a matter of law to the Defendant.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 8
Not Reported in A.2d, 2001 WL 946521 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

### C. WSFS'S COUNTERCLAIM FOR BREACH OF CONTRACT

Defendant has filed a counterclaim against Plaintiffs for breach of contract, based on Plaintiffs filing of this lawsuit in contravention of Plaintiffs' contractual promises not to sue under the three releases.

*7 A release is a type of contract.[FN33] In this case, the consideration for the three releases was Plaintiffs' surrender of all claims and causes of action in exchange for the Defendant's repeated extension of the loan relationship with Plaintiffs. Defendant bargained for and relied on Plaintiffs' promises not to sue. By the institution and maintenance of this action, Plaintiffs are in breach of the contracts to release Defendant from liability.

> FN33. *E.I. Du Pont de Nemours and Co. v. Florida Evergreen Foliage,* Del.Supr., 744 A.2d 457, 462 (1999).

Accordingly, the Court awards judgment in favor of the Defendant's counterclaim for breach of contract. Plaintiff is ordered to pay the costs and expenses, including attorneys' fees, incurred by the Defendant in this lawsuit.

### IV. CONCLUSION

For the foregoing reasons, Defendant WSFS's Motions for Summary Judgment are GRANTED.

IT IS SO ORDERED.

Del.Super.,2001.
Edge of the Woods v. Wilmington Savings Fund Society, FSB
Not Reported in A.2d, 2001 WL 946521 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in A.2d                                                          Page 1
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
(Cite as: Not Reported in A.2d)

**C**
Elite Cleaning Co., Inc. v. CapelDel.Ch.,2006.Only the
Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.
Court of Chancery of Delaware.
ELITE CLEANING COMPANY, INC., d/b/a Elite
Building Services, Plaintiff,
v.
Walter CAPEL and Artesian Water Company, Inc.,
Defendants.
**No. Civ.A. 690-N.**

Submitted Feb. 3, 2006.
Decided June 2, 2006.

Jeffrey K. Martin, Lori A. Brewington, Margolis
Edelstein, Wilmington, Delaware, for Plaintiff.
Scott A. Holt, Molly A. DiBianca, Young Conaway
Stargatt & Taylor, LLP, Wilmington, Delaware, for
Defendants.

MEMORANDUM OPINION
PARSONS, Vice Chancellor.
**\*1** This action is before the Court on Defendants,
Artesian Water Company, Inc. ("Artesian") and Walter
Capel's, motion for summary judgment. Plaintiff, Elite
Cleaning Company, Inc. ("Elite"), filed this action on
September 10, 2004 alleging that Capel, a former
janitor for Elite, breached his noncompetition
agreement and that Artesian tortiously interfered with
Elite's rights under that agreement. Elite seeks an
injunction as well as $565,000 in damages. Capel
asserted a counterclaim alleging that Elite violated the
Fair Labor Standards Act, 29 U.S.C. §§ 201-219
("FLSA"), by not compensating him for overtime and
travel time between jobsites. For the reasons stated,
Defendants' motion for summary judgment is granted in
part and denied in part.

I. BACKGROUND

A. Facts

Elite is a privately held corporation located in New
Castle, Delaware. It has approximately 150 employees
and is owned by Cheryl Ecton, its president. Elite
provides basic janitorial services, including floor care
services, carpet cleaning, ceiling tile cleaning, and
ultrasonic cleaning services to residences and
commercial enterprises. About 98% of Elite's business
is in Delaware, with the remainder in Pennsylvania.

Companies that use Elite's services either contract with
Elite directly or hire another company for which Elite
acts as a subcontractor. In this case Artesian hired
Capital Cleaning Services ("Capital") who hired Elite
as a subcontractor. Capital, a New York corporation,
subcontracts its work to cleaning companies all over the
United States. Elite has worked as one of Capital's
subcontractors for approximately five years and
receives a substantial amount of work from it.

An independent contractor agreement defines the
relationship between Elite and Capital. In particular the
agreement contains a nonsolicitation provision that
prevents Elite from soliciting business from any of
Capital's clients during the term of the agreement and
for a period of two years following its termination.
Further, when Elite cleans Artesian's building they bill
Capital not Artesian.

In December 2000, Capel began working as a janitor
for Elite. When he first started working for Elite the
company required Capel to sign several
pre-employment forms including an acknowledgement
that provides:
I hereby understand and agree to abide by the Elite
Cleaning Co., Inc. Employee Manual. Failure to do so
may result in immediate termination, disciplinary or
legal action.
I also hereby understand and agree to abide by the Elite
Cleaning Co., Inc., solicitation and Agreement Not To
Compete, Section VII of this Employee Manual. Failure
to do so will result in immediate termination and legal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 2
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

action. [FN1]

> FN1. Defs.' App. to Opening Br. in Supp. of
> their Mot. for Summ. J. ("DOB App.") A22.

The parties dispute whether Elite provided a copy of the
referenced employee manual to Capel. In this litigation,
Elite has not produced the version of the employee
handbook that the acknowledgement form refers to;
instead, it produced a copy of Elite's current employee
manual entitled "Elite Building Services Employee
Manual." [FN2] Elite alleges the current version contains
the same language as the earlier Employee Manual in
all relevant respects.[FN3] The 2003 version states:

> FN2. The Elite Building Services Employee
> Manual was issued in July 2003 and evidently
> replaced the earlier version entitled "Elite
> Cleaning Co., Inc. Employee Manual."
> Compare Compl. Ex. C with Compl. Ex. B.

> FN3. Pl.'s App. to Answering Br. in Opp'n to
> Defs.' Mot. for Summ. J. ("PAB") B109
> (Ecton Aff. ¶ 9).

**\*2** *7. SOLICITATION AND AGREEMENT NOT TO
COMPETE*
Solicitation and/or job procurement of any client held
by Elite Building Services, for a period of 2 years from
termination or release of employment is prohibited by
any employee either active or inactive. Any second or
third party involvement is prohibited. Being hired by
the client for any type of job is prohibited for a period
of 2 years from termination or release of employment.
This violation will result in immediate termination and
legal action.
While employed by Elite Building Services, all
personnel are prohibited from working for any other
business in the janitorial field that would stimulate a
conflict of interest.[FN4]

> FN4. DOB App. A21.

As a janitor, Capel performed basic cleaning duties,
such as emptying trash cans, dusting, vacuuming,
sweeping, and mopping.[FN5] His job required no special
skills. Elite paid Capel between \$8 and \$10 per hour
and did not provide him with any benefits.[FN6] When
Capel worked for Elite he would go directly to the job
site and clean the building.

> FN5. DOB App. A58-59.

> FN6. DOB App. A57-58

In the spring of 2004, while working for Elite, Capel
noticed a job posting on Artesian's bulletin board for a
"Facilities Maintenance" or custodian position. [FN7] This
position paid substantially more than Elite and included
health insurance for Capel and his family.[FN8]

> FN7. The parties dispute whether Capel
> initially accepted a position as a custodian
> with a job description including vacuuming
> and cleaning or as a facilities manager with a
> job description that did not include vacuuming
> or cleaning. Compare DOB App. A98 with
> PAB App. B120. For purposes of the pending
> motion, I assume Elite's position is correct and
> the job included vacuuming and cleaning.

> FN8. PAB App. B120.

Artesian hired Capel in March 2004. Shortly before he
began working for Artesian Capel notified Elite of his
intention to change jobs. Approximately two weeks
later, Capel's supervisor informed him that his
pre-employment contract barred his employment by
Artesian.

On Capel's last day of work at Elite, April 19, 2004, he
met with Ecton at her request. She informed Capel that
he could not work for Artesian because he had signed
a covenant not to compete. Capel responded that he did
not know of any restrictions on his ability to work for
Artesian and that he took the position at Artesian
because it presented a more favorable situation for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 3
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

himself and his family.

Subsequently, Elite sent Capel and Artesian several letters informing them that unless Artesian terminated Capel Elite would commence legal proceedings against them. Artesian responded by offering to provide Elite with cleaning opportunities if it would drop its demand that Artesian fire Capel. Elite rejected this offer and sued Artesian and Capel on September 10, 2004. Shortly thereafter Artesian discontinued using Capital for cleaning services.

### B. Procedural History

Elite filed its verified complaint on September 10, 2004. The complaint seeks a temporary restraining order, preliminary injunction and permanent injunction, enjoining Capel for a period of two years from working for Artesian. Elite also seeks damages and attorneys' fees.

Capel filed an answer and counterclaim on October 12, 2004. The counterclaim seeks to hold Elite liable for violations of the FLSA. In particular it alleges that Elite willfully engaged in the practice of failing to pay Capel (i) overtime for all work he performed in excess of 40 hours per week at a rate of not less than one and one half times his regular rate of pay, (ii) wages for work he performed during meal breaks, and (iii) wages for his travel time between worksites and time spent obtaining various supplies for Elite. As damages Capel seeks to recover the amounts owed for unpaid overtime compensation, unpaid travel time compensation, liquidated damages equal to the amount of back pay due him and his attorneys' fees.

**\*3** Defendants have moved for summary judgment in their favor on all the counts of Elite's complaint and on Capel's counterclaim. Having considered the parties' briefs and heard argument on that motion and for the reasons stated in this memorandum opinion, the Court has determined to grant the motion in all respects except for the FLSA claim as to unpaid travel time.

## II. ANALYSIS

### A. Standard

Under Court of Chancery Rule 56, the Court will grant summary judgment only when the parties do not dispute any issue of material fact and the moving party is entitled to judgment as a matter of law .[FN9] The Court must view the facts in the "light most favorable to the nonmoving party, and the moving party has the burden of demonstrating that there is no material question of fact." [FN10] A party opposing summary judgment, however, "may not rest upon the mere allegations or denials of [their] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial. If [the party] does not so respond, summary judgment, if appropriate, shall be entered against [them]." [FN11] The Court "also maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application." [FN12]

FN9. Ch. Ct. R. 56(c); *Motorola, Inc. v. Amkor Tech., Inc.,* 849 A.2d 931, 935 (Del.2004).

FN10. *Tanzer v. Int'l Gen. Indus., Inc.,* 402 A.2d 382, 385 (Del.Ch.1979) (citing *Judah v. Delaware Trust Co.,* 378 A.2d 624, 632 (Del.1977)).

FN11. Ch. Ct. R. 56(e).

FN12. *Cooke v. Oolie,* 2000 WL 710199, at *11 (Del. Ch. May 24, 2000).

### B. The Noncompetition Agreement

Capel challenges the noncompetition agreement's enforceability as well as its application to him. As to the applicability of the agreement Capel contends that the noncompetition agreement only prevents Capel from working for a client of Elite and that Artesian is not Elite's client. Capel also asserts that his duties at Artesian differ from those at Elite. Finally, Capel contends that the noncompetition agreement only applies to current employees. In my opinion, these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 4

questions involve fact driven issues that are disputed by the parties and cannot be resolved on a motion for summary judgment. In that regard, I note, for example, that Elite has adduced evidence and alleged several facts that call into question the integrity and credibility of Capel. Assuming those allegations are true and drawing all reasonable inferences from them in Elite's favor, as required on a motion for summary judgment, the Court cannot rely on anything that Capel personally has averred for purposes of the pending motion. Because I find that whether the noncompetition agreement, if valid and enforceable, would apply to Capel is not ripe for summary judgment, I will not address that issue further.

When seeking specific performance of a covenant not to compete, the plaintiff has the burden of establishing her case by clear and convincing evidence.[FN13] Where a restriction on the ability to be gainfully employed is involved, the customary sensitivity of a court of equity to the particular interests affected by its remedies is heightened.[FN14]

>    FN13. *Id.* at *17.

>    FN14. *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch.1987).

When assessing the enforceability of a noncompetition agreement the Court must first determine whether the plaintiff had a valid contract with the defendant and, if so, whether it was breached.[FN15] Next the court must determine whether the noncompetition agreement is reasonable in scope and duration, both geographically and temporally. Then the court must assess the legitimate economic interest of the party enforcing the covenant, and finally balance the equities.[FN16] If it appears that the interests the employer seeks to protect are slight or ephemeral while the consequences of specific enforcement to the employee are grave, equity may well leave the plaintiff to pursue his legal remedies and decline to grant the special remedy of injunction.[FN17]

>    FN15. *All Pro Maids, Inc. v. Layton*, 2004

Del. Ch. LEXIS 116, at *8 (Del. Ch. Aug. 9, 2004).

>    FN16. Due to the unique circumstances of this case, I will address whether Elite has a legitimate economic interest to enforce the noncompetition agreement before discussing whether the agreement has a reasonable scope.

>    FN17. *McCann*, 611 A.2d at 9.

**\*4** Delaware courts have favored the public interest of competition in their review of noncompetition agreements.[FN18] Nevertheless, the courts will specifically enforce a former employee's agreement not to compete in the proper circumstances, when its purpose and reasonable operation is to protect the legitimate interests of the former employer and it is not otherwise void as against public policy or contrary to the equities presented.[FN19]

>    FN18. *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *15 (Del. Ch. Apr. 15, 2004).

>    FN19. See *Research & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992).

A noncompetition agreement will only be enforced to protect the legitimate economic interests of the employer. Interests which the law has recognized as legitimate include protection of employer goodwill and protection of employer confidential information from misuse.[FN20] Courts also consider whether the restrictions on competition would work an undue hardship on the employee.[FN21] Likewise, where a noncompetition agreement would harm the public interest the court may hold the agreement invalid.[FN22]

>    FN20. *Id.*

>    FN21. *Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *13 (Del. Ch. Oct. 23, 2002).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 5
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN22. *Hammermill Paper Co. v. Palese,* 1983
WL 19786, at *4 (Del. Ch. June 14, 1983).

1. Is there a valid contract between Capel and Elite?

a. Can a noncompetition agreement contained in an
employee manual be incorporated by reference in a
summary "agreement" signed by the employee?

Capel asserts that the noncompetition agreement is not
valid because Elite merely referred to it in a five line
acknowledgement form that Capel signed when he
began working for Elite (the "Acknowledgement"). In
particular, Capel asserts that courts do not recognize
agreements in employee manuals as contracts. Capel
further asserts that Elite failed to meet its burden of
proving a contract existed because it did not produce
the specific employee manual referenced in the
summary document Capel signed. Specifically, Elite
produced the current version of its employee manual
entitled "Elite Building Services Employee Manual"
whereas Capel's Acknowledgement refers to the "Elite
Cleaning Co., Inc. Employee Manual." Consequently,
Capel argues that Elite cannot bind him to an agreement
that it did not even produce in this litigation.[FN23]

FN23. Capel denies having a copy of any Elite
Employee Manual. PAB App. B56.

Elite responds that employee handbooks are contracts
and that there has been no change in the noncompetition
provision of the employee handbook. Additionally,
Elite asserts that it specifically informed Capel about
the noncompetition agreement when it hired him.

"The law is well settled, [ ] that an employee handbook,
which does not set forth terms, conditions, or duration
of employment, does not constitute a contract between
an employer and employee." [FN24] The mere existence of
an employee handbook does not create an enforceable
contract right, particularly where there is no written
employment contract and there has been no promise of
employment for a definite or fixed period of time.[FN25]

FN24. *Bray v. L.D. Caulk Dentsply Int'l,* 748
A.2d 406, 2000 WL 313423, at *1 (TABLE)
(Del.2000).

FN25. *Bray v. L.D. Caulk Dentsply Int'l,* 1999
WL 1225966, at *2 (Del.Super.Oct. 22, 1999)
("Here, all of Plaintiff's breach of contract
claims arise from the employee handbook.
There was no written contract, nor was
Plaintiff promised employment for a definite
or fixed period of time. Plaintiff was an 'at
will' employee. After considering the facts in
the light most favorable to [plaintiff], I find
that [defendant] is entitled to summary
judgment on [plaintiff's] claim for breach of
contract.").

In this case the "Elite Building Services Employee
Manual" (the "Employee Manual") sets forth guidelines
for employees relating to: 1) conduct, 2) dress code, 3)
wages, 4) attendance, 5) accident/emergency situations,
6) solicitation, 7) safety and security, and 8)
disciplinary action.[FN26] The Employee Manual does not
say *anything* about the duration of Capel's employment.

FN26. Verified Compl. Ex. B.

**\*5** Further, Elite cited no document that addresses
whether it employed Capel as an "at will" employee or
for a fixed period of time. In employment law, there is
a strong presumption against permanent positions. In
fact, this presumption is so strong that "it usually is not
rebutted by an agreement which specifies that it is for
'permanent' or 'lifetime' employment." [FN27] Rather, a
clear and definite intention to overcome the
presumption of at will employment must be expressed
in a contract.[FN28]

FN27. *Carlson v. Hallinan,* 2006 WL 771722,
at *10 (Del. Ch. Mar. 21, 2006) *quoting
Greene v. Oliver Realty, Inc.,* 526 A.2d 1192,
1196 (Pa.Super.1987) (internal quotations
omitted).

FN28. *Id.* (internal quotations omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 6

Because Elite presented no evidence that it employed Capel for a fixed period of time I will follow the strong presumption in favor of at will employment. Thus, the Employee Handbook itself does not constitute a valid contract. [FN29]

> FN29. *Bray,* 1999 WL 1225966, at *2.

Whether Capel's signing of the five line Acknowledgement provides a basis for enforcing the noncompetition agreement in the Employee Manual presents a closer question. Elite required Capel to sign this summary document to obtain his job as a janitor, but offered him nothing beyond at will employment at $8 per hour and no benefits in exchange. There also is conflicting evidence on whether Capel actually received a copy of the employee manual at the time he signed the Acknowledgment.

Further, Elite has not produced the version of its employee handbook that it seeks to enforce. In this regard, Elite alleges that the later Employee Manual it did produce contains the same language as the prior version that Capel acknowledged. In support of that allegation, Elite relies on a statement to that effect in Ecton's Affidavit, citing two letters from 1997 and 1999, respectively, from its counsel to third parties quoting virtually the same noncompetition language that appears in the first two sentences of Section 7 of the 2003 Employee Manual.[FN30] In the 2003 Employee Manual those two sentences read: "Solicitation and/or job procurement of any client held by Elite Building Services, for a period of 2 years from termination or release of employment is prohibited by any employee either active or inactive. Any second or third party involvement is prohibited."

> FN30. The language from the earlier letters is substantively identical to the first two sentences in the Employee Manual, but reflects the company's previous name. Compare Compl. Ex. B with PAB App. B112-13.

Since Capel signed the Acknowledgment in 2000, I consider Elite's evidence sufficient to support an inference for purposes of evaluating a motion for summary judgment that the 2000 version of the employee manual included substantively the same language as that just quoted. There is an important difference, however, between the letters Elite relies upon and Section 7 of the 2003 Employee Manual. The latter document contains additional language that is not mentioned in either the 1997 or 1999 letter. The noncompetition provision in the 2003 Employee Manual also states:
Being hired by the client for any type of job is prohibited for a period of 2 years from termination or release of employment. This violation will result in immediate termination and legal action.
While employed by Elite Building Services, all personnel are prohibited from working for any other business in the janitorial field that would stimulate a conflict of interest.

*6 Apart from a conclusory and imprecise assertion by Ecton, Elite presented no evidence that the 2000 employee manual included this additional language.[FN31] Indeed, the record supports an inference that the additional language was added in 2003. For example, the form of acknowledgment attached to the 2003 Employee Manual contains significant additional language that was not included in the Acknowledgment Capel signed in 2000.[FN32] Therefore, I find that Elite has failed to prove the existence of a noncompetition agreement that includes anything beyond the first two sentences of Section 7 of the 2003 Employee Manual.

> FN31. *Atamian v. Hawk,* 842 A.2d 654, 658 (Del.Super.2003) ("The nonmovant cannot create a genuine issue for trial through bare assertions or conclusory allegations.").

> FN32. Compare Compl. Ex. B with Compl. Ex. C.

The facts of this case support at least a colorable argument that the noncompetition agreement is not enforceable as a matter of contract law. The legal significance of the brief, standard form

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 7
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Acknowledgment is questionable based on its wholesale reliance on the employee manual, the absence of any promise to employ Capel for a definite time period, and the relatively unskilled nature of the job for which Capel was hired.[FN33] Because there appear to be genuine issues of material fact on at least some of those matters, however, I do not believe this question can be resolved on summary judgment.

FN33. *See Bray*, 1999 WL 1225966, at *2.

b. Did Elite's failure to pay Capel overtime excuse his performance under the noncompetition agreement?

Capel contends that the noncompetition agreement is unenforceable because Elite breached any employment agreement that existed by not paying Capel for overtime or travel expenses. I have held *infra* that Capel is entitled to summary judgment on his FLSA claim, but only to the extent that Elite failed to pay Capel overtime. Therefore, I will limit my discussion to whether that failure excuses Capel's performance under the noncompetition agreement.

"If [a] plaintiff [is] guilty of any material breach of his employment contract, he may not enforce its provisions against the defendant." [FN34] In *Dickinson Medical Group, P.A. v. Foote,* for example, the court found that the medical group's failure to pay a physician a $4,150 bonus provided for in her employment agreement constituted a material breach and excused the physician from performance under her covenant not to compete.[FN35]

FN34. *Schutzman v. Gill,* 154 A.2d 226, 230 (Del. Ch.1959).

FN35. 1989 WL 40965, at *7-8 (Del.Super.Mar. 23, 1989).

Similarly in this case Elite agreed to compensate Capel for his labor. By not fully compensating Capel for his work as required by the FLSA, Defendants argue that Elite breached the employment agreement it had with Capel. Defendants failed to cite any case, however, in

which a court actually held that a violation of the FLSA constitutes a "breach" of an at will employment relationship equivalent to a breach of contract. Furthermore, Elite underpaid Capel by at least $232 in overtime or about 29 hours of work at $8 an hour. While $232 is not a great deal of money, it arguably might be material given Capel's rate of compensation. In relative terms, the amount is not much different from the unpaid bonus found to be material breach in *Dickinson.*

*7 Based on the novelty of the breach issue as a matter of law and the fairly undeveloped factual record on the question of materiality, I find that Defendants have not shown that they are entitled to summary judgment that the FLSA violation renders the noncompetition agreement unenforceable. In my opinion, a more thorough development of the record would help clarify the law and its application to the facts of this case on that issue.[FN36]

FN36. *See Cooke v. Oolie,* 2000 WL 71099, at *11.

2. Does the noncompetition agreement serve a legitimate economic interest of Elite?

Defendants contend that Elite does not have any legitimate economic interest that needs the protection of a noncompetition agreement. They assert that Elite's covenant would prevent legitimate, ordinary competition. Elite responds that it has a legitimate economic interest in preventing its employees from working directly for their clients thereby cutting Elite out of the business process. Courts often refer to this as a company's interest in protecting itself from disintermediation. Disintermediation is the actualization of the ever-present cry to eliminate the middleman, i.e., direct solicitation, negotiation and contracting between the customer and the worker.

Elite asserts that if it cannot prevent an employee like Capel from working directly with its clients it will go out of business because all of its clients could hire Elite's employees directly. Artesian responds that Elite's interest in preventing disintermediation is minor at best.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Artesian also contends that even without the protection of a noncompetition agreement Elite would not be eliminated from its line of business because employers use Elite due to the unique benefits their business offers. Particularly, Elite's clients receive the benefit of not having to hire and manage a cleaning staff.

"Eliminating the middleman is at first blush a facile and attractive alternative. However, middlemen exist because they provide a useful and highly-valued service." [FN37] Elite did not identify any other interest its noncompetition agreement served other than disintermediation. Thus, if Elite's covenant with its employees is to have a legitimate justification, that justification must be to protect Elite's role as a middleman in the market for cleaning services.

> [FN37.](#) *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.,* 720 F.2d 1553, 1558 (11th Cir.1983).

The Court is not aware of any Delaware case that specifically addresses whether disintermediation is a legitimate economic interest. Other jurisdictions have addressed that issue, however. For example, in *Consultants & Designers, Inc. v. Butler Service Group, Inc.,* the plaintiff located employees for clients who needed short-term, highly skilled technical workers that they could not obtain from their local areas. [FN38] The plaintiff, serving as a middleman, would locate such workers who also were relatively mobile in fields such as engineering, designing, drafting, and data processing. Due to their diminished job security and lack of other employee benefits, clients had to pay these temporary employees a substantial premium (approximately 30%) over employees they hired directly. [FN39] Therefore, to prevent disintermediation the plaintiff required all of its employees to sign a noncompetition agreement that prevented them from working for one of the plaintiff's clients for at least 90 days following the completion of their assignments. [FN40] Based on those facts, the court in *Consultants & Designers, Inc.,* held that the plaintiff had a legitimate interest in protecting itself from disintermediation. [FN41]

> [FN38.](#) 720 F.2d 1553, 1555.
>
> [FN39.](#) *Id.*
>
> [FN40.](#) *Id.* at 1556.
>
> [FN41.](#) *Id.* at 1559.

**\*8** Several other jurisdictions also have held that disintermediation is a legitimate economic interest. [FN42] When considered in the context of their facts, the holdings in those cases make sense. The facts of this case, however, are much different. Elite did not have to train its employees, like Capel, and those employees do not possess a high level of skill. They work for only slightly more than minimum wage and receive no benefits. In addition, there is no evidence that Elite discloses trade secrets or valuable proprietary information to such employees. Therefore, while I find that Elite has a legitimate interest in preventing disintermediation, I consider that interest very weak in the case of janitors, like Capel.

> [FN42.](#) *Aerotek, Inc. v. Burton,* 835 So.2d 197, 201 (Ala.Civ.App.2001) (finding that the plaintiff had a legitimate interest in preventing disintermediation); *Volt Servs. Group v. Adecco Employment Servs., Inc.,* 35 P.3d 329, 334 (Or.Ct.App.2001) ("In the absence of an enforceable restrictive covenant, plaintiff's employees simply could have agreed with Nike to eliminate the middleman, thereby diverting all of plaintiff's business-a process known as disintermediation."); *Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc.,* 946 F.Supp. 495, 502 (E.D.Ky.1996) ("the interest of the much maligned but time-honored middleman is a legitimate one that deserves protection against disintermediation.") (internal quotations omitted).

3. Is the noncompetition agreement reasonable in scope?

Elite argues that because courts have recognized two

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 9

years as a reasonable length of time for a noncompetition agreement the length of the agreement in this case is reasonable. Further they assert that the agreement is reasonable in geographic scope because it only prevents Capel from working for Elite's clients. Defendants respond that the noncompetition agreement is unreasonable in scope.

Under Delaware law, the courts will not enforce a noncompetition agreement "that is more restrictive than an employer's legitimate interests justify or that is oppressive to an employee." [FN43] Noncompetition agreements covering limited areas for two or fewer years generally have been found reasonable. [FN44] In *RHIS, Inc. v. Boyce,* however, Vice Chancellor Lamb found a two year restriction unreasonable. [FN45]

> FN43. *RHIS, Inc. v. Boyce,* 2001 WL 1192203, at *6-7 (Del. Ch. Sept. 26, 2001) (internal citations omitted).

> FN44. *Am. Homepatient, Inc. v. Collier,* 2006 WL 1134170, at *2 n .5 (Del. Ch. Apr. 19, 2006).

> FN45. 2001 WL 1192203, at *6-7.

The *RHIS* case involved a noncompetition agreement with a home inspector who had no prior home inspecting experience before his employment with plaintiff. At trial plaintiff identified two primary reasons it needed the protection of a noncompetition agreement: (1) that it paid for Boyce to acquire his [American Society of Home Inspectors] certification and, thus, had some right to prevent Boyce from using that certification to compete against it, and (2) that, as a part of his employment at RHIS, Boyce developed relationships with RHIS's business referral sources that he should not be able to exploit to the detriment of RHIS. [FN46]

> FN46. *Id.* at *5

The Court held that plaintiff did not have a protectible

interest in Boyce's home inspection license and that "a two year restriction on a former employee soliciting business from his former employer's referral network is unreasonably long." [FN47] Therefore, the court reformed the agreement and entered an injunction prohibiting Boyce from soliciting business from any person known by him to have been a referral source of RHIS for one year. [FN48]

> FN47. *Id.* at *7.

> FN48. *Id.*

Similarly, I find that Elite has not demonstrated a need for a two year noncompetition agreement to protect itself from disintermediation. Courts that have analyzed covenants designed to protect an employer from disintermediation have found restrictions for less than one year reasonable. [FN49] None of these cases, however, involved an unskilled worker, like Capel, who received no specialized training. Thus, as in *RHIS,* I find the temporal scope of Capel's two year noncompetition agreement unreasonable. Although the Court arguably could reform Capel's noncompetition agreement to specify a significantly shorter period, I do not consider that appropriate here because I find the agreement as a whole unenforceable.

> FN49. *Volt Servs.,* 35 P.3d at 198 (finding a temporary employment agency's 90-day restrictive covenant reasonable to protect against disintermediation); *Aerotek, Inc.,* 835 So.2d at 202 (finding a 180 day restrictive covenant that was limited to a single employer reasonable to prevent disintermediation with respect to an employment agency that placed highly skilled temporary workers); *Consultants & Designers, Inc.,* 720 F.2d at 1557-58 (finding a 90 day restrictive covenant reasonable to prevent disintermediation with respect to an employment agency that placed highly skilled, relatively mobile, technically trained workers in specific fields).

### 4. Balancing the equities

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 10
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

*9 Capel contends that the balance of the equities favors him because Elite's economic interest is weak at best and enforcement of the noncompetition agreement would undermine his ability to support his family. Elite responds that Capel is a low level worker who easily could obtain employment elsewhere with similar compensation. Moreover, they assert that if the noncompetition agreement is not enforced Elite's clients could eliminate them from the work cycle or its employees might try to take away the work they do through Elite. [FN50]

> FN50. Ecton Aff. ¶¶ 6-7; PAB App. B109.

Elite's business interest in disintermediation is minor given the fact that Capel does not have any knowledge of Elite trade secrets or customer lists, has no special skills or training, is not highly compensated, and has not been shown to have been trying to take business away from Elite or to have caused that effect. [FN51] Although the Court is not aware of any Delaware case that specifically addresses the enforceability of a noncompetition agreement against a comparably unskilled employee, other jurisdictions have dealt with this issue.

> FN51. DOB App. A68. There is no evidence that Artesian's purpose in posting the job opening for which Capel applied and was hired was to displace Capital or its subcontractor Elite as their cleaning service. To the extent Elite contends that Capel's obtaining a "facilities maintenance" job at Artesian violates the noncompetition agreement regardless of Artesian's intent, I note that the two sentence agreement that applied in 2000 is not clear on that point. The agreement prohibits "[s]olicitation and/or job procurement of any client held by Elite." As noted above, it is debatable whether Artesian, which contracted with Capital, was a client of Elite. In addition, the terms "solicitation and/or job procurement of" could be read to require taking work away from Elite. Perhaps

recognizing this limitation, Elite expanded its 2003 noncompetition provision by adding the following sentence: "Being hired by the client for any type of job is prohibited for a period of 2 years from termination or release of employment." Compl. Ex. B.

A New Hampshire court refused to enforce a noncompetition agreement for light industrial laborers who were not in a position to appropriate the company's goodwill and were without access to sensitive information, because it was "contrary to public policy and would impose an undue hardship, particularly for at-will employees who could be discharged at any time." [FN52]

> FN52. *Nat'l Employment Serv. Corp. v. Olsten Staffing Serv. Inc.,* 761 A.2d 401, 405 (N.H.2000) (finding a 90 day noncompetition agreement for temporary employees unreasonable and unenforceable). *See also Accent Stripe Inc. v. Taylor,* 204 A.D.2d 1054, 1055 (N.Y.App.Div.1994) (Refusing to grant a preliminary injunction to enforce a noncompetition agreement because plaintiff was not likely to succeed on the merits since "[d]efendant's position as an epoxy rig operator is not highly compensated and requires no unique skills or specialized training ... [and] defendant was not shown to have knowledge of trade secrets or to have threatened disclosure of such secrets to his new employer to plaintiff's disadvantage.").

Similarly, a Rhode Island court ruled that "singling out employees at relatively low levels of employment, such as that of the defendant, rather than those at the middle and upper levels, for post-employment noncompetition agreements suggests that the purpose of those agreements is not so much to protect an employer's trade secrets and confidential business information but rather to exercise economic control over certain classes of employees." [FN53] Thus, after balancing the harms the court concluded "that far greater harm [would] befall this defendant, if preliminary relief is granted, than any harm the plaintiff has demonstrated will befall it, if he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

is allowed to continue his employment with its competitor." [FN54]

> FN53. *Narragansett Coated Paper Corp. v. Lapierre,* 1998 WL 388400, at *2-3 (R.I.Super. June 30, 1998).

> FN54. *Id.*

Likewise, Capel was an at will employee of Elite who did not have access to any sensitive information, received no training, and received compensation (without benefits) only slightly above minimum wage. Under these circumstances the balance of the equities weighs against enforcement of the noncompetition agreement. Enforcing the agreement would work serious hardship on Capel and discourage him from seeking better employment and greater security for his family elsewhere. Elite, on the other hand, has a minor interest in protecting itself from disintermediation, and reasonably could have protected that interest with far less onerous restrictions, such as imposing a modest requirement of liquidated damages to discourage clients from hiring away its employees. On balance, based on a careful review of the facts of this case, I find that Capel is entitled to summary judgment that the noncompetition agreement is unenforceable.

### C. The Tortious Interference Claim

*10 Artesian asserts that Elite does not have a valid tortious interference claim because it did not have a business opportunity with Artesian since Elite's contract with Capital prohibited Elite from working directly with Artesian. Consequently, Artesian argues that Elite had no reasonable expectation of obtaining business from it. Moreover, Artesian points out that even Elite's President, Ecton, admitted that Artesian did not have an obligation to continue doing business with Capital and could discontinue using them (and thus indirectly Elite) at any time. Elite disagrees, claiming that Artesian was its client and that Artesian knowingly aided Capel in violating the noncompetition agreement.

The elements of a claim of tortious interference with

contract are: (i) the existence of a valid contract; (ii) the interferer's knowledge of the contract; (iii) intentional interference that induces or causes a breach of the contract; and (iv) damages. [FN55] The Court applies these elements to a particular case in light of a defendant's privilege to compete or protect her business interests in a fair and lawful manner. [FN56] Additionally, a party to a contract may not bring a tortious interference claim against a co-party to the same contract. [FN57]

> FN55. *Am. Homepatient, Inc. v. Colier,* 2006 WL 1134170, at *4 (Del. Ch. Apr. 19, 2006).

> FN56. *Malpiede v. Townson,* 780 A.2d 1075, 1099 (Del.2001).

> FN57. *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1058 (Del. Ch. Nov. 27, 1984).

Elite's tortious interference claim fails for several reasons. First, Elite cannot state a claim against Artesian for tortious interference with Capel's noncompetition agreement because I have found that agreement unenforceable. [FN58] Second, Elite did not show that it had a reasonable expectation of obtaining business from Artesian. Although Elite dealt with Artesian on a regular basis, it did so only indirectly in its capacity as a subcontractor to an Artesian vendor, Capital. In fact, Artesian's agreement with Capital prohibited them from directly hiring Elite. [FN59] Consequently, Elite never had a reasonable expectation of working directly with Artesian and it presented no evidence that Capel's acceptance of employment with Artesian was likely to have caused Artesian to terminate its contract with Capital.

> FN58. *Am. Homepatient, Inc.,* 2006 WL 1134170, at *4 (absent a breach there cannot be tortious interference with a contract).

> FN59. DOB App. A49-50.

Moreover, Capital not Artesian decided which subcontractor would clean Artesian's facilities. [FN60] Furthermore, Ecton acknowledged that Artesian had the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 12
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

right to discontinue business with Capital (and thus indirectly Elite) at any time.[FN61] The only reasonable inference from the evidence presented in connection with Defendants' motion for summary judgment is that Artesian decided to fire Capital because Elite sued it. That was Artesian's prerogative. Therefore, I conclude that Artesian is entitled to summary judgment on Elite's claim for tortious interference.

FN60. DOB App. A48-51.

FN61. DOB App. A77. *See Gilbert v. El Paso Co.*, 1988 Del. Ch. LEXIS 150, at *40 (Del. Ch.1988) ("To constitute tortious interference, the act that is claimed to have interfered with the contract relationship or business opportunity must itself have been wrongful.").

D. Capel's Fair Labor Standards Act ("FLSA") Claim [FN62]

FN62. The FLSA is contained in 29 U.S.C. §§ 201-219 (2006).

Capel makes two claims under the FLSA. First, he claims Elite did not compensate him for overtime. Second, he asserts that Elite did not compensate him for travel time between job sites.

At the argument on Defendants' summary judgment motion I noted several inconsistencies between Elite's payroll records and the sheet Defendants attached to their opening brief purporting to summarize the amount of Capel's alleged unpaid wages and travel time.[FN63] Consequently, following argument, Capel sent a letter to the Court reducing the number of pay periods for which he seeks damages. Specifically, the letter asserts that Capel seeks $233.60 in unpaid overtime compensation for the pay periods between (1) July 29 and August 11, 2002, and (2) August 12 and August 25, 2002, as well as unpaid travel time in the amount of $155.76.[FN64] Thus, Capel now seeks a revised amount of $389.36 in unpaid wages, $389.36 in liquidated damages, and attorneys' fees.

FN63. I also observed that the time sheets Elite provided to Capel are difficult to read and to follow due to heavy redacting and the poor quality of the copies. Furthermore, I could not resolve at least one inconsistency in Elite's payroll records, and believe that problems with its recordkeeping contributed to the apparent inconsistencies in some of Capel's numbers. "It is well-settled that when an employer fails to keep adequate records of its employees' compensable work periods, as required under the FLSA, employees seeking recovery for overdue wages will not be penalized due to their employer's record-keeping default." *Reich v. Southern New Eng. Telecomm. Corp.*, 121 F.3d 58, 69 (2d Cir.1997).

FN64. Capel did not reduce the amount of his request for compensation for lost travel time.

*11 Elite alleges that it paid Capel $509.48 in overtime compensation shortly after he filed his counterclaim and made every effect to resolve the issue after Capel brought it to their attention. Apart from its time records, the only evidence Elite presented on the FLSA case is the following conclusory statement in Ecton's Affidavit: "I have thoroughly reviewed the counterclaim documentation presented by Walter Capel's counsel and I am quite certain that Mr. Capel owes Elite in excess of $300.00 as an overpayment of the claimed amount due. Elite owes no money whatsoever to Capel for any overtime claim." [FN65] "Accord and satisfaction[, however,] is not a valid defense in a private action brought under the FLSA." [FN66] Thus, I find this argument unpersuasive.[FN67]

FN65. PAB App. B111.

FN66. *Morrison v. Exec. Aircraft Refinishing, Inc.*, 2005 U.S. Dist. LEXIS 10190, at *11 (S.D.Fla. Apr. 8, 2005).

FN67. Nevertheless, the Court will reduce any damages award to Capel under the FLSA by up to $509.48 to account for any payment he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                         Page 13
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

received from Elite after the commencement of this action.

The question before me is whether the evidence supports a grant of summary judgment to Capel on his FLSA claim. To prevail on such a motion, the employee need only present evidence sufficient to support a just and reasonable inference that he has performed work for which he was entitled to additional compensation, but did not receive it.[FN68] Upon such a showing, the burden shifts to Elite to present evidence sufficient to demonstrate the existence of a genuine issue of material fact pertaining to Capel's FLSA counterclaim. [FN69]

> FN68. *Gatto v. Mortgage Specialists of Ill., Inc.,* 2006 WL 681063, at *3 (N.D.Ill. Mar. 13, 2006) *citing Anderson v. Mount Clemens Pottery Co.,* 328 U.S. 680, 686-88 (1946), *superceded by the Portal to Portal Act of 1947,* § 4(a)(1), 29 U.S.C.A. § 254(a)(1), *on other grounds.*

> FN69. *Tunnell v. Stokley,* 2006 WL 452780, at *2 (Del. Ch. Feb. 15, 2006).

### 1. Overtime

Elite admittedly is a covered employer under the FLSA.[FN70] Elite also admits that for the period of his employment Capel was a nonexempt, hourly employee. Further, Elite concedes that they failed to pay Capel "some" overtime.[FN71]

> FN70. *See* Counterclaim & Answer to Counterclaim ¶ 6.

> FN71. Letter from Jeffrey Martin, Esq. to the Court dated March 16, 2006 at 3.

The applicable provision of the FLSA, 29 U.S.C. § 207(a)(1), provides:
Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, for a workweek longer than

forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

The summary of Capel's hours for the pay period beginning on August 12 and ending on September 1, 2002 shows that he worked a total of 138.97 hours during that three week period. Therefore, at a minimum, Elite should have paid Capel 120 hours at regular pay and 18.97 hours at a rate of at least one and one-half times the regular pay rate. Thus, Elite underpaid Capel by $75.88 during that time period.[FN72]

> FN72. *See* DOB App. A162. This conclusion is based on Elite's summary payroll records. Elite's more detailed records for shorter periods within the same time interval covered by the summary are extremely difficult to read and seemingly inconsistent. DOB App. A161-175. Accordingly, the Court has relied on the summary documents, which should be at least as favorable to Elite as the more detailed records.

Similarly, Capel worked 119.03 hours for the pay period beginning on July 29, and ending on August 11, 2002.[FN73] Consequently, Elite should have paid Capel 80 hours at regular pay and 39.03 hours at the overtime rate. Thus, Elite underpaid Capel by $156.12 during this time period. In total, Elite underpaid Capel by $232 for overtime he worked.

> FN73. *See* DOB App. A171.

### 2. Travel time

Capel asserts that because Elite's payroll records do not show any compensation for his travel time between jobsites he has met his burden of proving that Elite violated the FLSA by failing to compensate him for travel time. Elite retorts that Capel should not receive compensation for travel time because they allege he did not go from job to job, but instead went home when

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 14
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

traveling between job sites. In support of this allegation Elite avers that Capel lives five minutes from Artesian and that it takes approximately 17 minutes to travel between job sites. Yet, Capel requests compensation for travel times ranging from 32 to 110 minutes.

*12 The regulations pertaining to the FLSA provide: Time spent by an employee in travel as part of his principal activity, such as travel from job site to job site during the workday, must be counted as hours worked.... If an employee normally finishes his work on the premises at 5 p.m. and is sent to another job which he finishes at 8 p.m. and is required to return to his employer's premises arriving at 9 p.m., all of the time is working time. However, if the employee goes home instead of returning to his employer's premises, the travel after 8 p.m. is home-to-work travel and is not hours worked.[FN74]

FN74. 29 C.F.R. § 785.38.

In my opinion, Elite has presented sufficient evidence to support a reasonable inference that Capel did not travel directly from job site to job site, considering the close proximity of his home and the questionable length of the travel time. Although such an inference may prove to be incorrect at trial, it precludes a grant of summary judgment in favor of Capel on his FLSA claim for failure to pay travel expenses.

3. Liquidated damages and attorneys' fees

Elite contends that they do not have to pay Capel attorneys' fees or liquidated damages because they corrected the underpayment in his wages as soon as Capel brought it to Elite's attention. Capel counters that any time an employer violates the FLSA by failing to pay overtime or travel expenses the court must award the employee liquidated damages and attorneys' fees.

In 29 U.S.C. § 216, the FLSA provides: Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their

unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

Under Section 216, liquidated damages are compensatory, not punitive in nature.[FN75] These damages are intended to compensate employees for losses they might suffer by reason of not receiving their lawful wage at the time it was due.[FN76] An award of liquidated damages is mandatory and the court has no discretion to deny such an award unless the employer shows that it "acted in good faith and that [it] had reasonable grounds" for believing it was not in violation of the FLSA. The employer has the burden of demonstrating both elements.[FN77]

FN75. *Marshall v. Brunner,* 668 F.2d 748, 753 (3d Cir.1982).

FN76. *Id.*

FN77. *Brock v. Claridge Hotel & Casino,* 846 F.2d 180, 187 (3d Cir.1988).

Further, the statute mandates an award of attorneys' fees to reflect the congressional intent that wronged employees be able to seek recovery of unpaid wages without incurring burdensome expenses for legal fees and costs.[FN78]

FN78. *Roofers Local 307 v. G & M Roofing,* 732 F.2d 495, 502 (6th Cir.1984).

Elite's sole argument against this Court awarding liquidated damages, costs, and attorneys' fees under the FLSA is that they did not know they failed to pay Capel overtime and paid the overtime as soon as he brought it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 15
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)
(Cite as: Not Reported in A.2d)

to their attention. Elite did not pay Capel for unpaid
overtime until January 28, 2005, over 9 months after his
last day at Elite and 28 months after Capel performed
the work.[FN79] An employer, however, cannot use
ignorance to support a claim that it acted in good faith
and had reasonable grounds for believing it was not in
violation of the FLSA.[FN80] Thus, Elite's ignorance of its
failure to pay Capel provides no defense to his claim for
liquidated damages, costs, and attorney's fees under the
FLSA.

> FN79. Letter from Jeffrey Martin, Esq. to the
> Court dated March 16, 2006 at 2. Capel's last
> day at Elite was April 19, 2004.

> FN80. *Rogers v. Savings First Mortgage,
> LLC,* 362 F.Supp.2d 624, 638 (D.Md.2005).

### III. CONCLUSION

*13 For the reasons stated Defendants' motion for
summary judgment is GRANTED IN PART and
DENIED IN PART. In particular, all of the claims in
Elite's Verified Complaint are dismissed with prejudice
and judgment is entered in favor of Capel and against
Elite on Capel's Counterclaim under the FLSA for
unpaid overtime in the amount of $232 in actual
damages and $232 in liquidated damages, plus a
reasonable attorney's fee and costs. In all other respects,
Capel's motion for summary judgment is denied.

Trial on any remaining issues will proceed as scheduled
on June 22, 2006. Furthermore, Capel is directed to
submit its detailed petition for attorney's fees and costs
on the FLSA claim for unpaid overtime within 20 days
of the date of this memorandum opinion. Elite shall file
any opposition to that submission within 20 days
thereafter.

IT IS SO ORDERED.

Del.Ch.,2006.
Elite Cleaning Co., Inc. v. Capel
Not Reported in A.2d, 2006 WL 1565161 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



Not Reported in A.2d                                                    Page 1

Not Reported in A.2d, 2001 WL 1671149 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H**
Rudnitsky v. RudnitskyDel.Ch.,2001.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
Claire G. RUDNITSKY and C.M.S. Associates, a general partnership of the State of Delaware Plaintiffs,
v.
Steven H. RUDNITSKY, Joseph D. Kulesza, Jr., Joseph W. Benson, P.A ., C.D.B. Finance Corporation, a a corporation of the Commonwealth of Pennsylvania, and Howard M. Hyman, Defendants.
**No. Civ.A. 17446-NC.**

Submitted Sept. 20, 2001.
Decided Dec. 20, 2001.

Daniel R. Losco, of Losco & Marconi, P.A., Wilmington, Delaware; and Richard E. Franta, Wilmington, Delaware; for Plaintiffs.
Joseph D. Kulesza, of Agostini Levitsky Isaacs & Kulesza, Wilmington, Delaware; Andrew G. Ahern, III, of Joseph W. Benson, P.A. , Wilmington, Delaware; and R. Karl Hill, of Seitz Van Ogtrop & Green, P.A., Wilmington, Delaware; for Defendants.

*MEMORANDUM OPINION*
JACOBS, Vice Chancellor.
*1 Pending is a proceeding arising out of an order directing the defendant, Steven H. Rudnitsky (" Steven"), to show cause why judgment should not be entered for the plaintiffs on Count III of the Amended Complaint. At issue is whether the Court should rescind a settlement between the parties, which marks the latest chapter in an ongoing feud between Steven and his mother, co-plaintiff Claire G. Rudnitsky ("Claire"). I find, for the reasons discussed below, that Steven has failed to show cause why judgment should not be entered in the plaintiffs' favor.

I. FACTUAL BACKGROUND

This litigation arises out of the tangled affairs of a family-owned partnership, C.M.S Associates (" C.M.S"), of which Steven and Claire were the partners at the time this lawsuit arose. Claire originally brought this lawsuit on behalf of herself and C.M.S., to invalidate certain mortgages that Steven had caused to be placed on the partnership's property without Claire's knowledge or consent. In its Opinion dated November 14, 2000, which was later implemented by an Order issued on January 3 2001, this Court (i) invalidated the mortgages, (ii) ordered that C.M.S. be dissolved, and (iii) entered a money judgment in favor of Claire and against Steven.[FN1]

> FN1. *Rudnitsky v. Rudnitsky,* Del. Ch., C.A. No. 17446, Jacobs, V . C., mem. op. (Nov. 14, 2000). For a more complete statement of the background facts underlying the mortgage dispute and the preceding disputes, the reader is referred to that Opinion.

A. The Settlement of The Dispute

On March 2, 2001, Steven and Claire settled their overall dispute, by entering into an agreement in which Steven (i) agreed to incur charges against his C.M.S. capital account, the effect of which was to reduce that account to a negative ($89,621.16); and (ii) assigned his C.M.S. partnership interest to Claire for consideration that included cash, the satisfaction of her judgment as assignee of a third party judgment creditor, and a waiver of her right to require Steven to restore his impaired partnership capital account. Pursuant to that settlement agreement, Steven assigned his partnership interest to Claire. He also executed an appropriate form evidencing the termination of his status as a partner of C.M.S., as well as a receipt for the cash component of the settlement consideration package.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2001 WL 1671149 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 2

Thereafter, Claire executed and filed a revised Registration of Trade Name, which disclosed that she was the sole principal of C.M.S. Associates. Claire also took steps to sell the C.M.S. Building, which was the partnership's sole remaining asset.

### B. Steven Repudiates The Settlement

Ten days later, on March 12, 2001, Steven filed with the Register in Chancery a document denominated as a "Motion for Request for Cease & Desist Order for all activities concerning CMS Property and Releasing and publishing all records, notes, bills, etc. for C.M.S. Associates from 1983 until present by Michael Amon CPA, Richard Franta, Esq but not limited to such." Accompanying that document were two letters to the Court enclosing a "Motion for Request for Expedited Trial, as per Request filed March 12, 2001," requesting that the Court "Prevent any action on said property both in repairs, marketing," and "[e]stablish a gag order." On April 2, 2001, Steven also filed with the Register in Chancery a "Motion of Lis Pendens" relating to the C.M.S. Building located at 1624 Delaware Avenue, Wilmington, Delaware. The effect of these motions was to upset the sale of the C.M.S. Building, which had been scheduled to close on August 4, 2001.

### C. Claire Claims That The Repudiation Breached The Settlement Agreements And Seeks Judgment on Her Claims

*2 In response to the foregoing, counsel for Claire moved to amend and supplement the complaint, to add Count III. That Count alleges that the Assignment Agreement executed by Steven was valid and binding, and that Steven's repudiation of the settlement constituted a breach of the covenants contained in the Assignment Agreement and in the other instruments that Steven had executed. The Court granted the motion to amend. It also issued an Order directing Steven to show cause why the plaintiffs should not be granted judgment on Count III of their Amended Complaint.

The show cause hearing was held on July 23, 2001.

At that hearing the Court heard testimony from four witnesses: Claire, Richard Franta, Esquire (Claire's attorney), Rabbi Daniel Satlow, Howard Hyman (Steven's cousin), and Steven, who represented himself. Having considered these witnesses' testimony, as well as the other evidence of record, I find the pertinent facts to be as set forth below.

### D. Facts Relating To The Validity Of The Parties' Settlement

As earlier stated, Steven, who is a college graduate and holds a Masters of Business Administration, was a partner in C.M.S. After his father's death, Steven also operated The Smoke Shop, a family business located in the C.M.S. Building. By early 2000, Steven had become embroiled in litigation with the State of Delaware Department of Revenue over nonpayment of a sizeable judgment lien for taxes generated by The Smoke Shop. He was also embroiled in litigation with his ex-wife over unpaid child support that the Division of Child Support (and Steven's former wife) were attempting to collect. The dispute with the Department of Revenue was resolved by this Court ordering (at the instance of the Department) that The Smoke Shop be closed and its assets sold. In connection with the tax-related litigation, Steven took the position that he had sold The Smoke Shop to his cousin, Howard Hyman, and was no longer in a position to comply with the Court's order, since he no longer controlled the business operations. After a factual hearing, the Court rejected Steven's position, finding that his testimony lacked credibility. Ultimately, The Smoke Shop was shut down, and what assets it had were liquidated. Because Steven lacked the funds to pay his share of the debts of the partnership business, the resulting financial burden fell to C.M.S.'s other partner-Steven's mother, Claire.

After the tax litigation was resolved, Claire attempted to get a fix on the assets and liabilities of the partnership. In the course of doing that, she learned that Steven had, unbeknownst to her and without her permission, placed several mortgages on the partnership property to secure personal loans to himself. Claire then filed this action against her son for a declaration that the mortgages were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 3

Not Reported in A.2d, 2001 WL 1671149 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

invalid, and for an order canceling the mortgage instruments. As earlier noted, this Court invalidated the mortgages, finding them in violation of the partnership agreement, which required Claire's consent as a precondition. Thereafter, Claire and Steven entered into the settlement which Steven now seeks to repudiate.

**\*3** Initially, Steven did not specify the basis for his contention that the various settlement agreements were invalid, but at the July 23, 2001 show cause hearing he advised the Court that the legal grounds for his position were that: (i) he had signed the various settlement instruments under duress, and (ii) he lacked the mental capacity to contract. The evidence that Steven introduced to support these contentions was essentially his own unsubstantiated testimony, which is next summarized.

Steven testified that at the time of the settlement, he was in urgent need of money, to pay over $7,200 of unpaid child support obligations. Those arrearages had resulted in Steven spending the prior three weekends incarcerated, by reason of a Family Court Order, in the Plummer Center in Sussex County. Steven testified that he settled his dispute with Claire solely to obtain the cash he so desperately needed to discharge that obligation, to avoid having to spend another weekend in jail. Avoiding further jail time was essential, Steven said, because: (i) his life had been threatened, and he also had been approached by a homosexual inmate, while at Plummer; (ii) he was mentally depressed, was on antidepressant medication, and was desperate and incoherent; and (iii) he would have done anything to keep out of prison.

Accordingly, Steven called Mr. Franta and agreed to settle the case. Thereafter, on March 2, 2001, Steven drove 89 miles to Mr. Franta's office, where he (1) executed the assignment of his partnership interest and other settlement documents, (2) accepted a settlement check for $7,248.67 from Claire, and then (3) immediately drove to the Division of Child Support, where he (4) delivered the check and received documentation of the payment that enabled him to secure his release from custody.

Steven also testified that even though he read the settlement papers before he signed them, he did not know that he was signing away his partnership interest to his mother. Nor did he realize he had done this until the end of that week. One week thereafter, on March 12, 2001, Steven filed his motion to rescind the settlement.

The only other witness whose testimony was probative on the material issues was Mr. Franta, Claire's counsel.[FN2] Mr. Franta testified that Steven himself proposed the settlement, and that when Steven came to his office to read and sign the settlement documents he seemed normal, did not appear delirious, was not crying or hallucinating, did not exhibit slurred speech, and was more focused than usual.[FN3] Importantly, Mr. Franta testified that he exerted no pressure on Steven to sign the documents, and that Steven read the documents before he signed them. Mr. Franta specifically recalled that when Steven came across the provision of the Assignment Agreement which recited that he (Steven) was not acting under duress, Steven commented to Mr. Franta that he was acting under duress. To that Mr. Franta replied "Steven, if you think that you are under duress, we won't sign. Go see a lawyer if you wish." Steven declined that invitation and signed the agreements.

> FN2. Claire, who was called by Steven as a hostile witness, did not testify on any matter of significance to the issues presented here. Rabbi Satlow and Mr. Hyman were called as witnesses by Steven. Although their testimony was credible, it did little to aid Steven's cause. Rabbi Satlow and Mr. Hyman, who had communicated with Steven during the days before the settlement, essentially corroborated Steven's testimony that he (Steven) was distraught and depressed, but those witnesses were otherwise unable to shed any helpful light on Steven's claims of duress and mental incapacity.

> FN3. Mr. Franta also testified that although Steven had made suicide threats to him (Franta) on past occasions, he made

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 4

Not Reported in A.2d, 2001 WL 1671149 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

no such threats at the time he executed the settlement documents.

**\*4** Lastly, Mr. Franta testified that Claire substantially changed her position in reliance on the settlement, in that she solicited offers to sell the C.M.S. Building, entered into an agreement of sale, paid all tax arrearages, and satisfied the claims of other partnership creditors. Claire would not have done this absent the settlement, because if Steven were still a C.M.S. partner, he would have had the power to veto those financial arrangements that Claire paid (on behalf of the partnership) out of her own pocket.

As discussed more fully below, I find Mr. Franta's testimony entirely credible, and find Steven's testimony-that he entered into the settlement under duress and that he could not understand the significance of the documents he was signing-entirely incredible.

## II. ANALYSIS

### A. Summary of Steven's Invalidity Claims

Although at the hearing Steven limited his challenge to the settlement to claims of duress and lack of mental capacity, in a post-hearing letter memorandum dated August 19, 2001 Steven enlarged his challenge to encompass other claims. The additional claims were that (1) Steven was unduly influenced to sign the settlement papers, (2) Claire breached the C.M.S. Partnership Agreement, and (3) Mr. Franta committed perjury and also engaged in conduct amounting to contempt of court. All these claims are addressed in this Opinion. The burden of proving those claims and (as a consequence) of establishing the invalidity of the settlement, rests upon Steven.[FN4] For the reasons next discussed, Steven has failed to carry that burden.

> FN4. *McAllister v. Schetter,* Del. Ch., 521 A.2d 617 (1986) (burden of proving incompetence to enter into a transaction

falls on the party attacking the transaction); *accord* 13 Am.Jur.2d *Cancellation,* § 10 (2000); *Berdel, Inc. v. Berman,* Del. Ch., C.A. No. 13579, Jacobs, V.C., mem. op. at 12 (Dec. 15, 1997) (absent a confidential or fiduciary relationship, the party asserting undue influence has the burden of proof).

### B. The Claim of Mental Incapacity

Steven's mental incapacity claim amounts to a contention that he was "under heavy medication that causes mind altering moods." That claim finds support only in Steven's uncorroborated, self-serving testimony. Steven submitted no evidence of precisely what medications he was taking, and no medical evidence as to the effect of such medications on his mental state. In addition, and apart from that failure of proof, the undisputed facts show that Steven's mind was not so altered or befuddled so as to prevent him from understanding the nature of his impending jail sentence, from traversing major highways to arrive safely at Mr. Franta's office to pick up a settlement check, or from driving a further distance to discharge his child support obligation so as to avoid further jail time at the Plummer Center. Steven's claim of mental incapacity is rejected for failure of proof.

### C. The Duress/Undue Influence Claim

Although Steven claims that when he entered into the settlement agreement he was under duress, his post-trial letter memorandum suggests that the settlement was also the product of undue influence. To establish duress sufficient to void a contract there must be "(1) a 'wrongful' act, (2) which overcomes the will of the aggrieved party, and (3) who has no adequate remedy to protect himself."[FN5] To establish undue influence sufficient to prevent the formation of a binding contract, the party asserting that claim must show that he was unfairly persuaded to enter into the agreement in circumstances where the person exercising the persuasion either dominated the victim, or where the relationship between the parties justified the assumption that that influencing person would not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1671149 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

act detrimentally to the victim's interests.[FN6] Where (as here) no fiduciary or confidential relationship exists between the parties, the party who claims undue influence has the burden of proof. [FN7] That burden was not met. In this case the claims of duress and undue influence fail, both factually and legally.

> FN5. *Cianci v. JEM Enterprise, Inc.,* Del. Ch., C.A. No. 16419, Lamb., V.C., mem. op. at 23 (Aug. 22, 2000); *Restatement (Second) of Contracts* § 175(a); *see also* 25 Am.Jur.2d *Duress* § 1 (1996).

> FN6. Restatement (Second) of Contracts § 177 (1979).

> FN7. *Berdel, Inc. v. Berman, supra* n. 4.

**\*5** Steven has failed to carry his burden of proving duress, because there is no evidence that Claire or her attorney, Mr. Franta, made an improper threat-or indeed, any threat-to Steven. Indeed, no threat is claimed. The only "threat" Steven faced was a lawful sentence, imposed by the Family Court, ordering his incarceration for non-payment of child support. And if that were not enough, the interchange between Steven and Claire's attorney, Mr. Franta, demolishes any duress claim. It will be recalled that before he executed the Assignment of his partnership interest, Steven read its recital stating that he was not acting under duress, and then suggested to Mr. Franta that the recital was incorrect because he (Steven) was signing under duress. Mr. Franta pointedly responded that "if you think that you are under duress, we won't sign. Go see a lawyer if you wish." As earlier noted, Steven declined that invitation and signed the settlement documents.

Regarding undue influence, it is clear to begin with, that Claire was not in a dominant or fiduciary relationship with Steven. Their relationship at the time was solely as litigation adversaries and was manifestly hostile. Not only was Claire *not* in a position to exert improper influence over Steven, but also she exerted no influence at all. It was Steven-not Claire-who proposed the settlement and

was its driving force. Besides *not* having contacted Steven to propose the settlement and assignment of partnership interest, throughout the settlement discussions Claire never spoke with her son at all. Nor can Steven credibly claim that he lacked any reasonable alternative or adequate legal remedy to protect himself. He had the alternative of not settling, which meant returning to the Plummer Center to which he had been lawfully sentenced. Having to serve that sentence may have been unpleasant, and perhaps (to Steven) unpalatable, but that prospect, without more, does not constitute duress.

In short, Steven has not made out, even *prima facie,* a case of duress or undue influence that would void the settlement. All he has shown is that he was depressed and terrified about the prospect of returning to jail. Of that the Court has no doubt. At that point Steven had lost his livelihood from the family business, he was embroiled in bitter litigation with his mother and his ex-wife, and he had been sentenced to prison for non-payment of child support. What rational person would not be depressed over that state of affairs? But that, without more, does not establish that Steven signed away his partnership interest because he was improperly persuaded to do so or because (inconsistently) the proverbial gun was pointed at his head. To the contrary, Steven's agreement to the settlement-which he had proposed-was an act of consummate rationality: it was the only way left for Steven to extricate himself from his prison sentence. Having made a deliberate, calculated decision to enter into the settlement, and having enjoyed its benefits, Steven now, without the threat of incarceration hanging over him, seeks to renege on his agreement without offering (or showing the ability) to return the parties to the *status quo ante.*

**\*6** I pause on this last point-Steven's retention of the benefits of the settlement-because that fact defeats not only his claim of duress and undue influence, but also the remedy of rescission altogether. A critical requirement for rescission is that the plaintiff be willing and able to restore the *status quo ante.*[FN8] Steven has made no such offer or shown that he has the financial ability to do so. Restoration of the *status quo* would require Steven to repay not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 6

Not Reported in A.2d, 2001 WL 1671149 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

only the over $7,200 cash component of the settlement consideration, but also the tens of thousands of dollars Claire paid to discharge partnership debts for which Steven was legally responsible.

>    FN8. *Norton v. Poplos,* Del.Supr., 443 A.2d 1, 4 (1982).

Steven's retention of the settlement benefits also independently defeats his claims of duress and undue influence. Because a contract agreed to under duress (or by reason of undue influence) is voidable at the option of the victim, such an agreement may be ratified and rendered fully enforceable. As Vice Chancellor Lamb has stated, "[r]atification results if the party who executed the contract under duress accepts the benefits flowing from it for any considerable length of time after opportunity is afforded to annul or void it." [FN9] Thus, even if (contrary to my finding on this point) Steven's claims of duress and undue influence had been established factually as a legal matter, Steven's retention of the benefits of the transaction since March, 2001 defeats those claims. Accordingly, the claims of duress and undue influence are rejected.

>    FN9. *Cianci v. JEM Enterprise, Inc.,* supra at n. 6, mem. op. at 30 (Aug. 22, 2000) (quoting *Gallon v. Lloyd-Thomas Co.,* 264 F.2d 825, at 826 (8th Cir.1959).

### D. Steven's Remaining Claims

In addition to the claims previously addressed, Steven advances four other contentions. Those other contentions have either no or (at best) marginal relevance to the requested rescission remedy, but for the sake of completeness the Court addresses them at this point.

### 1. Mr. Franta's Alleged Perjury

Steven accuses Mr. Franta of perjury in connection with his hearing testimony relating to telephone messages left by Steven at Mr. Franta's office.

Specifically, both Mr. Franta and Mr. Hyman testified that Steven had made several veiled suicide threats over the course of this litigation. One of those threats was left on Mr. Franta's answering machine. Mr. Franta testified that he passed this information on to Dr. David Mandelbaum, a psychologist with offices in Mr. Franta's building. Steven claims that Franta's testimony was false, because he had not been Dr. Mandelbaum's patient since 1999 and because Dr. Mandelbaum had denied (presumably to Steven) that the referral had ever occurred. Dr. Mandelbaum did not, however, testify, nor was his affidavit submitted at the show cause hearing. Thus, Steven's claim of perjury rests solely on Steven's unsubstantiated statement-hardly proof that Mr. Franta committed perjury.[FN10]

>    FN10. Of a similar piece is Steven's claim that Mr. Franta falsely testified that he had faxed certain documentation to the Division of Child Support on March 2, 2001 to help assure that Claire's $7,248.67 check reached the Division in time for Steven to avoid further jail time. Steven's charge that this was not done is also unsubstantiated.

### 2. Mr. Franta's Alleged Contempt of Court

Steven next contends that Mr. Franta stands in contempt of court because he (Steven) had subpoenaed certain business records of C.M.S. in March, 2001 while Mr. Franta was counsel of record for C.M.S., and Mr. Franta never produced the subpoenaed documents. The short answer is that no subpoena was ever issued for the records and no other order of this Court required Mr. Franta or Claire to produce any records. There was no contempt of court.

### 3. Alterations to the C.M.S. Property

*7 Steven next complains of certain alterations made to the C.M.S. real estate located at 1624 Delaware Avenue in Wilmington. The claim is that certain signage had been removed, thereby devaluing the property, and that repair work was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 7

Not Reported in A.2d, 2001 WL 1671149 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

done to the building without certified craftsmen. The short answer is that that claim, even if true, has no relevance to the issue before the Court. If the assignment of partnership interest stands (as I conclude it does), then Claire, as the sole owner of C.M.S., is entitled to do with her property as she pleases.

### 4. *Challenge to Settlement Consideration*

Lastly, Steven challenges the consideration for the settlement, which totaled over $189,000 of cash, credits and debt forgiveness. The essence of this claim is that that amount is inadequate to compensate Steven for his one-third interest in a partnership whose sole asset is real estate that he values-again without substantiation-at $1.3 million. The only evidence of the property's fair market value, *i.e.,* what a willing seller will sell and what a willing buyer will offer for it, is that the real estate was under contract to a bona fide purchaser for $500,000. There is no evidence of record that the property was worth any more.

To summarize the rulings and findings made here, Steven has failed to establish that the settlement into which he entered, including the assignment of his partnership interest to Claire, was other than knowing and voluntary. Steven had a choice: return to jail for nonpayment of child support or assign his partnership interest to raise the cash that would enable him to pay the support obligation. Steven chose to settle. No one forced him to make that choice, and when he made it he possessed all of his rational mental faculties. Steven made an informed, calculated decision to settle, specifically to extricate himself from his jail sentence. In all likelihood he did that with the intent to repudiate the settlement at the earliest opportunity. This Court will not allow its processes to be used to aid that effort. Steven must live with the consequences of his choice.

### III. CONCLUSION

For the foregoing reasons, Steven has failed to show

cause why the settlement should not be upheld, and therefore judgment will be entered in plaintiffs' favor on Count III of their Amended Complaint. Counsel for plaintiffs shall submit an appropriate implementing form of order on notice.

Del.Ch.,2001.
Rudnitsky v. Rudnitsky
Not Reported in A.2d, 2001 WL 1671149 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on October 19, 2006, I caused a true and correct copy of the

foregoing to be served upon the following counsel of record in the manner:

**<u>By Hand Delivery</u>:**
Michael W. Modica, Esq.
715 King Street, Suite 300
P.O. Box 437
Wilmington, DE 19899

Arthur G. Connolly, III (#2667)

#494739_1

CM/ECF LIVE - U.S. District Court:ded                                              Page 1 of 1

## Briefs, Responses and Replies
1:06-cv-00496-JJF Tristrata Technology Inc. v. International Shield Inc. et al

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Connolly, Arthur entered on 10/19/2006 at 2:51 PM EDT and filed on 10/19/2006

**Case Name:**        Tristrata Technology Inc. v. International Shield Inc. et al
**Case Number:**      1:06-cv-496
**Filer:**            Tristrata Technology Inc.
**Document Number:** 14

**Docket Text:**
MEMORANDUM in Support re [11] MOTION for Summary Judgment filed by Tristrata Technology Inc..Answering Brief/Response due date per Local Rules is 11/2/2006. (Connolly, Arthur)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=10/19/2006] [FileNumber=289991-0
] [2f382f2f624bb41d4d2e9eb248a7998855cd250222ac4e761483b7cc84f4c5d462c
bcea7b30cc89b95bc0a01f28df30a9728ffe305c7f8bd1bdd53c1d9c1d8fc]]

**1:06-cv-496 Notice will be electronically mailed to:**

Arthur G. Connolly , III      aconnollyIII@cblh.com, dkt@cblh.com; telwell@cblh.com

Michael W. Modica      modicalaw@aol.com

**1:06-cv-496 Notice will be delivered by other means to:**