# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRISTRATA TECHNOLOGY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-496 (JJF) |
| | ) | |
| INTERNATIONAL SHIELD, INC., and ABDEL ATTIA | ) | |
| | ) | |
| Defendants. | ) | |

## APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFF
## TRISTRATA TECHNOLOGY INC.'S MOTION FOR SUMMARY JUDGMENT

Dated: October 19, 2006

Arthur G. Connolly, III (# 2667)
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141

Of Counsel:
Michael O. Warnecke
Douglas L. Sawyer
Aric S. Jacover
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 701-8602

Kevin M. McGovern
Brian T. Foley
McGovern & Associates
545 Madison Avenue, 15th Floor
New York, New York 10022
(212) 688-9840

*Counsel for TriStrata Technology, Inc.*

## TABLE OF CONTENTS

| Exhibit No. | Description |
|---|---|
| 1 | License Agreement |
| 2 | Personal Guaranty |
| 3 | Declaration of Brian Foley |
| 4 | Forbearance Agreement |
| 5 | Extension to Forbearance Agreement |
| 6 | Declaration of Molly Sherlock |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 19, 2006, I caused a true and correct copy of the

foregoing to be served upon the following counsel of record in the manner:

**By Hand Delivery:**
Michael W. Modica, Esq.
715 King Street, Suite 300
P.O. Box 437
Wilmington, DE 19899

Arthur G. Connolly, III (#2667)

#494739_1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 26, 2006, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF which will send notification of such filing

to the following counsel of record:

Michael W. Modica, Esq.
715 King Street, Suite 300
P.O. Box 437
Wilmington, DE 19899

        /s/Arthur G. Connolly, III    
        Arthur G. Connolly, III (#2667)

#494733_1

# EXHIBIT 1

## LICENSE AGREEMENT

THIS AGREEMENT, entered into and effective as of the 15th day of October, 2005 (the "Effective Date") by and between TRISTRATA TECHNOLOGY, INC., a Delaware corporation having its principal place of business at 1105 North Market Street, Suite 1300, P.O. Box 8985, Wilmington, Delaware 19899 (hereinafter referred to as "LICENSOR") and International Shield, Inc., a Minnesota Corporation having a principal place of business at 3500 Willow Lake Boulevard, # 500 St. Paul, Minnesota 55110 (hereinafter referred to as "LICENSEE");

## RECITALS

WHEREAS, LICENSEE in the course of its business sells cosmetic and skin care products and is interested in obtaining from LICENSOR a license to make, have made, use, distribute and/or sell Licensed Products (as hereinafter defined) under the Licensed Patent Rights (as hereinafter defined) in the Territory (as hereinafter defined); and

WHEREAS, LICENSOR and LICENSEE are currently engaged in litigation in the United States District Court for the District of Delaware styled, TriStrata Technology, Inc. v. Beauty Underneath, et al, Civil Action No. 04-1263 (JFF), concerning LICENSOR's claim of infringement of one or more of the Licensed Patents (as defined below) by LICENSEE (hereinafter referred to as the "Delaware Litigation");

WHEREAS, to LICENSEE's knowledge and belief, the Licensed Patent Rights (as hereinafter defined) are valid and enforceable; and

WHEREAS, subject to, and upon, all of the terms and conditions of this Agreement, LICENSOR is willing to grant to LICENSEE a non-exclusive license to make, have made, use and sell the Licensed Products (as hereinafter defined) under the Licensed Patent Rights (as hereinafter defined);

NOW, THEREFORE, in consideration of the foregoing premises and of the

mutual covenants, promises and agreements set forth herein, LICENSOR and LICENSEE, intending to be legally bound, hereby mutually agree as follows:

## ARTICLE I - GENERAL

1.01    All capitalized terms used in this Agreement (other than the names of parties and Article headings) shall have the meanings established for such terms herein.

1.02    LICENSEE, represents that it has independently examined and evaluated the value of the rights of LICENSOR in the Licensed Patent Rights (as defined in Section 2.02), believes that the Licensed Patent Rights are valid and enforceable and is desirous of obtaining a license from LICENSOR under said Licensed Patent Rights upon all of the terms and conditions set forth in this Agreement.

## ARTICLE II - DEFINITIONS

2.01    "Excluded Channel of Trade" shall mean products requiring a prescription.

2.02    "Licensed Patent Rights" shall mean, subject to the specific exclusions set forth in Section 2.03 below, those portions of the United States patents and United States patent applications set forth in Schedule 2.02 hereto and all issued divisions, continuations, continuations-in-part, reexaminations, reissues and extensions thereof, covering only:  the use of glycolic acid and/or its salts and/or lactic acid and/or its metallic salts alone or in combination with a sunscreen for the alleviation of the signs of aging of the human skin.

2.03    Notwithstanding anything herein to the contrary, "Licensed Patent Rights" shall not include any rights to any patents or patent applications that do not relate to:  a method for using glycolic acid and/or its salts or lactic acid and/or its metallic salts, or compositions comprising glycolic acid and/or its salts or lactic acid and/or its metallic salts, as the only alpha hydroxyacids in such compositions for the alleviation of the signs of aging of the human skin.

2

2.04   "Licensed Products" shall mean:  subject to the limitations set forth in Section 2.03 above, any cosmetic and/or dermatologic preparation comprising glycolic acid and/or its salts or and/or lactic acid and its metallic salts for topical application to human skin within the scope of the Licensed Patent Rights.

2.05   "Territory" shall mean the world.

2.06   An "Affiliate" of LICENSEE shall mean any currently wholly owned entities of LICENSEE, which are listed on Schedule 2.06 hereto, as said Schedule 2.06 may from time to time be amended by written agreement of both LICENSOR and LICENSEE. Affiliates of LICENSEE shall be subject to all of the terms and provisions of this Agreement.  No Affiliates of LICENSEE acquired after the date of signing of this Agreement shall be included hereunder without the prior written consent of LICENSOR, and shall only be added on such terms as shall be agreed to by LICENSOR and LICENSEE.

2.07   An "Affiliate" of LICENSOR shall mean any corporation, partnership or other entity which directly or indirectly controls, is controlled by, or is under common control with, LICENSOR.

## ARTICLE III - LICENSE GRANT

3.01   Subject to all of the terms and provisions of this Agreement, LICENSOR grants to LICENSEE and Affiliates of LICENSEE (as defined in Section 2.06) under the Licensed Patent Rights a non-exclusive license to make, have made, use and sell in the Territory Licensed Products except through the Excluded Channel of Trade.

3.02   Notwithstanding any provision herein to the contrary, no right is granted or otherwise conveyed by this Agreement to any entity to make, have made, use, sell or otherwise dispose of Licensed Products in the Territory other than to (1) LICENSEE; and (2) to the extent provided in Schedule 2.06 to this Agreement, as said Schedule 2.06 may be amended from time to time by written agreement of LICENSOR and LICENSEE, Affiliates of LICENSEE.

3.03    Notwithstanding any provision herein to the contrary, no right is granted or otherwise conveyed herein by LICENSOR to LICENSEE or to any Affiliate of LICENSEE to make, have made, use, sell or otherwise dispose of Licensed Products other than those which are sold and/or distributed under the brand name(s) and/or trademark(s) of LICENSEE or an Affiliate of LICENSEE listed on Schedule 3.03 hereto (the "Marks"), as said Schedule 3.03 may from time to time be amended by the written agreement of LICENSOR and LICENSEE. Licensed Products of LICENSEE and its Affiliates are currently sold and/or distributed in the Territory under the Marks set forth on Schedule 3.03 hereto. LICENSEE agrees that it will not make, have made, use, distribute or sell Licensed Products other than under the Marks.

3.04    As a condition to receiving the license under the Licensed Patent Rights hereunder, each Affiliate of LICENSEE must first execute and deliver to LICENSOR a written instrument in a form acceptable to LICENSOR pursuant to which such Affiliate of LICENSEE agrees to be bound by all of the terms and provisions of this Agreement applicable to LICENSEE. LICENSEE hereby unconditionally guarantees the compliance and performance by each Affiliate of LICENSEE with all of the provisions of this Agreement, including, without limitation, the payments of all amounts due to LICENSOR pursuant to any of the provisions of this Agreement.

3.05    The term of this Agreement and of the license granted hereunder shall commence as of the Effective Date and shall expire or terminate upon the expiration of the last to expire of the Licensed Patent Rights or upon the earlier termination of this Agreement pursuant to any of the provisions of Article VII of this Agreement.

3.06    LICENSOR specifically reserves the right to, and to grant licenses to others to, make, have made, use, sell or otherwise dispose of Licensed Products within or without the Territory on such terms as LICENSOR may deem appropriate.

3.07    No license, express or implied, is granted hereunder to any other patent rights or under any other patents or technology owned, used, or otherwise controlled by LICENSOR or any Affiliate of LICENSOR.

4

## ARTICLE IV - PAYMENTS, ROYALTIES AND REPORTS

4.01   (a)   In consideration for the license granted to LICENSEE hereunder, LICENSEE shall pay to LICESNOR according to the schedule set forth below the total amount of ███████████████ , representing a ████████████ Percent ████ royalty on past sales of Licensed Products by Licensor in the total amount of ████████████ through August 12, 2005. ████████████████████

████████████████████ Attached hereto as Schedule 4.01(a) is an affidavit from an officer of LICENSEE listing the Licensed Products sold by LICENSEE to date and attesting to the fact that the Deep Repair and Eye Return products do not contain and never did contain alpha hydroxyacids and/or contained alpha hydroxyacids in an amount less than .1% and only for use as a pH adjuster.

(b)   In addition the payments required by Paragraph 4.01(a) above, LICENSEE and permitted Affiliates of LICENSEE shall pay to LICENSOR in the manner set forth below, annual royalties of ████████████ on Sales of Licensed Products (as defined in Section 2.04 above), payable quarterly, made during such quarter by LICENSEE.

(c)   Commencing April 1, 2006 and for each year during the term of this Agreement, LICENSEE shall also pay to LICENSOR a minimum annual royalty of ████████████ payable quarterly in equal installments of ████████████ on January 1, April 1, July 1 and October 1 each year that this Agreement is in effect. Minimum annual royalty payments paid to LICENSOR are creditable against the running royalties owed pursuant to this Section

5

4.02(b) in the same calendar year in which the minimum annual royalty payment is made.

      4.02  For purposes of this Agreement, "Sales of Licensed Products" shall mean the gross amounts received by LICENSEE or an Affiliate of LICENSEE from, or on account of, the sale of Licensed Products to independent third parties, less credits or allowances actually granted by LICENSEE or an Affiliate of LICENSEE upon claims or returns. Sales are considered made for the purposes of this Agreement when invoiced by LICENSEE or an Affiliate of LICENSEE to an independent third-party or when payment is received, whichever occurs first.

      4.03  During the term of this Agreement as specified in Section 3.05, LICENSEE shall, and shall cause its Affiliates to, maintain complete and accurate records of all sales and transfers of Licensed Products and all payments due to LICENSOR hereunder. LICENSEE shall deliver to LICENSOR within forty-five (45) days after the close of each calendar quarter, a true and accurate written report, certified as true and correct by an officer of LICENSEE, setting forth the gross dollar amounts received by LICENSEE and Affiliates of LICENSEE for the sales or transfers of Licensed Products and the computation of the royalties to be paid to LICENSOR by LICENSEE and Affiliates of LICENSEE for such period. Each such report shall segregate the gross and net dollar sales amounts separately for LICENSEE and each Affiliate of LICENSEE. The first report shall be due on November 15, 2005 and shall include a report the royalty payment for Sales of Licensed Products from August 12, 2005 through September 30, 2005.

      4.04  Simultaneously with providing the report required in Section 4.03, LICENSEE shall pay to LICENSOR in United States Dollars the entire amount of royalties due to LICENSOR for the calendar quarter on account of which such report is made and submitted by wire transfer or by certified check.

      4.05  LICENSOR shall have the right, at its own expense, to request an audit of any quarterly period ending not more than three (3) years prior to the date of such request, and to appoint an independent accountant to perform such audit. The independent accountant appointed by LICENSOR shall have access to the business

records of LICENSEE and Affiliates of LICENSEE which are necessary or appropriate to verify the royalties payable to LICENSOR pursuant to this Agreement.  The independent accountant shall keep confidential information received from LICENSEE or its Affiliates, except for information necessary for disclosure to LICENSOR to report on the accuracy of LICENSEE's reports.  In the event that a deficiency of three percent (3%) or more is discovered between the actual royalty payment due to LICENSOR and the amount of the royalty payment specified in the written report submitted by LICENSEE to LICENSOR pursuant to Section 4.03, LICENSEE shall bear the costs of the audit conducted by LICENSOR.

4.06  All payments of royalties and other amounts due to LICENSOR pursuant to any of the provisions of this Agreement shall be made to LICENSOR by wire transfer or certified check or money order at the principal place of business of LICENSOR as specified in or pursuant to the provisions of Article XIII of this Agreement.

4.07  No amounts due hereunder shall be withheld by LICENSEE or Affiliates of LICENSEE, whether due to a claim of set-off or any other claim by LICENSEE of any amount due to LICENSEE from LICENSOR.

## ARTICLE V - REPRESENTATIONS AND WARRANTIES; LIMITATIONS

5.01  LICENSOR represents that it has the full authority to grant to LICENSEE the rights with respect to the Licensed Patent Rights in accordance with the provisions of this Agreement.

5.02  LICENSOR MAKES NO REPRESENTATIONS TO LICENSEE, EXTENDS NO WARRANTIES OF ANY NATURE, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND HEREBY DISCLAIMS ANY AND ALL WARRANTIES, AND LICENSOR ASSUMES NO LIABILITIES OR RESPONSIBILITIES OF ANY NATURE WHATSOEVER WITH RESPECT TO THE MANUFACTURE, DISTRIBUTION, SALE, USE OR OTHER DISPOSITION BY LICENSEE OR ANY AFFILIATE OF LICENSEE, OR ANY VENDEE OR OTHER TRANSFEREE OR USER OF ANY OF THE LICENSED PRODUCTS OR

7

OTHER PRODUCTS WHICH INCORPORATE, OR ARE FORMULATED OR MANUFACTURED BY USE OF, ANY OF THE LICENSED PATENT RIGHTS OR ANY OTHER INFORMATION FURNISHED BY OR IN CONNECTION WITH THIS AGREEMENT.

5.03   LICENSOR MAKES NO REPRESENTATION OR WARRANTY CONCERNING THE LICENSED PRODUCTS HEREIN AND IN NO EVENT SHALL LICENSOR OR ANY AFFILIATE OF LICENSOR BE LIABLE OR RESPONSIBLE TO LICENSEE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES.

5.04   Without limiting the disclaimers set forth in Sections 5.02 and 5.03, nothing in this Agreement shall be construed as:

(a)     a warranty or representation by LICENSOR as to the validity or scope of any patent right included within the Licensed Patent Rights;

(b)     a warranty or representation by LICENSOR that anything made, used or sold or otherwise disposed of by LICENSEE under this Agreement is or will be free from infringement of patents of third persons;

(c)     a requirement or obligation that LICENSOR furnish to LICENSEE any technical or manufacturing information concerning Licensed Products, or any of the substance of pending patent applications;

(d)     a grant by LICENSOR of any right to use in advertising, publicity, or otherwise a trademark, trade name, image or likeness of LICENSOR or its Affiliates, or any name, image or likeness of their respective employees, officers, or the inventors of any of the patents or patent applications included within the Licensed Patent Rights;

(e)     a representation or warranty by LICENSOR as to the usefulness, fitness, merchantability or suitability of any product to be

8

manufactured sold or otherwise distributed by LICENSEE or any Affiliate of
LICENSEE.

## ARTICLE VI - TRANSFERABILITY OF RIGHTS AND OBLIGATIONS

6.01   LICENSOR may assign any of its rights and obligations hereunder,
in whole or in part, without the prior written consent of LICENSEE.

6.02   LICENSEE may assign its rights and obligations under this
Agreement only upon a writing signed by LICENSOR consenting to such assignment.
Notwithstanding the foregoing sentence, in the event of a sale of substantially all of the
assets of LICENSEE, LICENSOR's consent to assignment will not be unreasonably
withheld.   Any attempt to transfer, assign or sublicense which is not in accordance with
the terms of this Agreement shall be void.

6.03   The provisions of this Agreement shall be binding upon and inure to
the benefit of all successors and permitted assigns of the parties hereto.

## ARTICLE VII - TERMINATION FOR BREACH

7.01   Prior to the expiration of the term of this Agreement, LICENSOR
may, at its option, terminate this Agreement and the license granted hereunder upon prior
written notice to LICENSEE if LICENSEE fails to pay within fifteen (15) days of the due
date any amount required to be paid hereunder or if LICENSEE breaches any of the
other covenants or provisions of this Agreement.  Notwithstanding the foregoing, unless
the breach is not capable of being cured, LICENSEE shall have fifteen (15) days from
receipt of notice from LICENSOR to pay such overdue amount in full or to cure such other
breach to LICENSOR and thereby avoid termination under this Section.  If:  (1) the
breach is not capable of being cured; (2) the overdue amount is not paid with interest at
the rate of one percent (1%) per month (but not to exceed the maximum amount of
interest permitted by applicable law) from the date due to the date paid; or (3) such other
breach is not cured within fifteen (15) days, then this Agreement and all licenses granted
hereby will terminate immediately and automatically without any further notice or action
on the part of LICENSOR.  In the event that the interest rate specified in this Section

9

exceeds the maximum rate of interest permitted by applicable law, such rate shall in such instance be reduced to the maximum permitted rate.

7.02    In the event that LICENSEE or any Affiliate of LICENSEE shall become insolvent; be declared bankrupt; voluntarily file or have filed against it a petition for bankruptcy or reorganization; unless such petition is dismissed within sixty (60) days of filing; enter into an arrangement for the benefit of creditors; enter into a procedure of winding up to dissolution; or should a trustee or receiver be appointed for its respective business assets or operations, LICENSOR may immediately terminate this Agreement and the license granted hereby, effective upon written notice to LICENSEE.

7.03    Under no circumstances (including, without limitation, a termination for any reason whatsoever) shall LICENSOR be obligated to refund any payments theretofore made by LICENSEE hereunder.

7.04    Except as otherwise specifically provided herein, expiration or termination of this Agreement and of the license granted hereby for any reason shall be without prejudice to:

(a)    the right of LICENSOR to receive all payments accrued and unpaid as of the effective date of such termination or to receive any payments or other amounts which may accrue after the date of termination; and

(b)    any other rights, remedies or obligations which LICENSOR may then or thereafter have under this Agreement or otherwise.

7.05    Upon the termination (but not expiration) of this Agreement, LICENSEE and its Affiliates shall cease all use of the Licensed Patent Rights. Notwithstanding the foregoing, LICENSEE and its Affiliates shall for a period of ninety (90) days following the effective date of termination be entitled to distribute and sell within the Territory through their regular channels of distribution any stocks of completed Licensed Products then in their possession, subject to the payment of royalties and other provisions of Section 4 of this Agreement. LICENSEE may terminate this Agreement for

10

convenience and thereupon shall no longer be required to pay minimum annual royalties pursuant to Section 4.01(c) upon the exhaustion of its inventory and cessation of sales of Licensed Products; provided however that upon termination all rights granted to LICENSEE pursuant to this Agreement shall cease.

7.06    The provisions of Sections 7.03 through Section 7.05 shall survive termination or expiration of this Agreement.

## ARTICLE VIII - THIRD-PARTY INFRINGEMENT

8.01    LICENSEE shall promptly notify LICENSOR after becoming aware of any third-party infringement of the License Patent Rights hereunder.

8.02    LICENSOR shall have the sole right, but not the obligation, to institute and control the prosecution of a suit or to take any other action for infringement of any of the Licensed Patent Rights. LICENSEE agrees to take no action with respect to any third-party infringement of Licensed Patent Rights unless expressly authorized to do so in writing by LICENSOR. LICENSEE agrees to, and to cause each of the Affiliates of LICENSEE to, cooperate with LICENSOR in all respects, to make employees of LICENSEE and any Affiliate of LICENSEE available to testify, to make available any records, papers, information, specimens and the like, and to join in any such suit as a voluntary plaintiff, upon LICENSOR's request. Any recovery or settlement obtained as a result of such suit or other action shall be retained by LICENSOR for its own use and benefit, and LICENSEE shall have no rights whatsoever in any such recovery or settlement, however, LICENSOR agrees to provide reasonable compensation to LICENSEE and/or its Affiliates for costs incurred by LICENSEE and/or its Affiliates for making employees available to testify and/or making available any documentary evidence.

8.03    Neither LICENSEE nor any Affiliate shall foster or encourage any infringement of the Licensed Patent Rights by any third-party. If LICENSEE and/or any of its Affiliates shall engage in such conduct, LICENSOR shall have the right to deem such conduct a material breach of this Agreement, which breach shall be a basis of termination of this Agreement and of the license granted herein, pursuant to Section 7.01 of this

11

Agreement.

## ARTICLE IX - MARKINGS

9.01   LICENSEE agrees to, and to cause Affiliates of LICENSEE to, mark in a conspicuous location all Licensed Products and/or the containers or packaging for any Licensed Product sold by LICENSEE or any Affiliate of LICENSEE with the word "Patent" or "Patents" and the number or numbers of the Licensed Patent Rights applicable thereto and with such additional legends, markings and notices as may be required by any law or regulation of any jurisdiction in the Territory or as LICENSOR may reasonably specify for purposes of compliance with any such law or regulation. LICENSEE and any Affiliate of LICENSEE shall mark any Licensed Products (and/or the containers or packaging therefor) using a process covered by any patent included in the Licensed Patent Rights with the number of each such patent and, with respect to Licensed Patent Rights, to respond to any request for disclosure under 35 U.S.C. § 287(b)(4)(B) by only notifying LICENSOR of the request for disclosure and the identity of the person or entity making such request for disclosure.   Notwithstanding anything contained in this Section 9.01 to the contrary, LICENSEE shall be permitted to exhaust its existing stock of packaging and labeling materials for Licensed Products although such materials do not include the numbers of the Licensed Patent Rights.

## ARTICLE X - INTEGRATION; AMENDMENT

10.01 This Agreement represents the entire understanding between the parties, and supersedes all prior or contemporaneous discussions, proposals, negotiations, understandings and other agreements, express or implied, between LICENSOR and LICENSEE with respect to the subject matter of this Agreement, and there are no representations, promises, conditions, provisions or terms, whether written or oral, with respect thereto, other than those specifically set forth in this Agreement.

10.02 No provision in this Agreement may be amended, altered, modified, discharged or terminated, except by a writing signed by a duly authorized representative

12

of LICENSOR and LICENSEE.

## ARTICLE XI - INDEMNIFICATION

11.01 LICENSEE and Affiliates of LICENSEE operating under this Agreement pursuant to Section 3.04 hereof shall jointly and severally defend, indemnify and hold harmless LICENSOR and the Affiliates of LICENSOR, and the officers, agents and employees of LICENSOR and its Affiliates, and the inventors (collectively the "Indemnified Parties") from and against any and all liabilities, damages, losses, claims, suits, proceedings, demands, recovery, costs and expenses (including, without limitation, the fees and expenses of counsel, litigation expenses, and court costs) which arise out of or relate to, or are alleged to arise out of or relate to: (i) use by LICENSEE or any Affiliate of LICENSEE of any of the inventions or information included in the Licensed Patent Rights contrary to the exclusions contained in Sections 2.03 of this Agreement; (ii) any personal injury, death or property damage which arise out of or relate to or are alleged to arise out of or relate to the manufacture, distribution, sale or use of products manufactured, sold or otherwise distributed by LICENSEE or any Affiliate of LICENSEE; or (iii) any breach by LICENSEE or any Affiliate of LICENSEE of any representation, warranty or covenant set forth in this Agreement.

11.02 During the term of this Agreement, and for such later term extending beyond the expiration of the term of this Agreement as LICENSEE or any Affiliate of LICENSEE may be selling Licensed Products, and for a period of two (2) years after the expiration of the shelf-life of the last of the Licensed Products sold by LICENSEE or any Affiliate of LICENSEE shall maintain: (1) all insurance and/or bonds required by law; and (2) comprehensive general liability insurance, including product liability insurance, written on an occurrence basis at the levels currently maintained by LICENSEE, (one million dollars ($1,000,000.00) base policy and ten million dollars ($10,000,000.00) excess coverage) for bodily injury, including death and property damage. Such amounts shall be subject to reasonable increases upon the fifth and tenth anniversaries of the date hereof to account for inflation and other relevant factors. The insurance coverage required by this Section 11.02 shall be provided with respect to all claims for damages to person or property arising out of the manufacture, formulation, processing, fabrication, sale or use

13

of any of the Licensed Products, regardless of when such claims are made or when the underlying damages or injuries occur or manifest themselves.  The policies of insurance shall:   (a) include an endorsement naming LICENSOR and its Affiliates and their respective officers, employees and agents as additional named insureds; and (b) provide that notice be given to LICENSOR not less than thirty (30) days prior to any cancellation or material change in any of such policies.

     11.03 The indemnity and insurance obligations of LICENSEE and the Affiliates of LICENSEE under this Agreement shall survive the termination or expiration of this Agreement and of the licenses granted pursuant to this Agreement in order to indemnify and hold harmless the Indemnified Parties (as defined in Section 11.01) with respect to any claims for which the Indemnified Parties are entitled to indemnification, irrespective of whether any such claim arose prior or subsequent to the effective date of termination or expiration.

## ARTICLE XII - PRESS RELEASES AND PUBLICITY

     12.01 The financial terms of this Agreement are strictly confidential and neither LICENSOR nor LICENSEE shall issue a press release or public announcement concerning, or otherwise disclose, the financial terms of this Agreement without the prior specific written consent of the other party.  Notwithstanding the foregoing, LICENSOR and/or LICENSEE may disclose in a press release, to potential licensees, or otherwise, the fact that this Agreement has been executed and entered into on mutually agreeable terms without disclosing the amount of the payments, the royalty rates hereunder or any of the other specific financial terms of this Agreement.

     12.02 Notwithstanding Section 12.01, LICENSOR or LICENSEE may disclose the terms of this Agreement in response to:   (a) an order from a court or governmental agency; (b) in response to a request by a party in litigation, provided an appropriate protective order has been entered; or (c) if such disclosure is necessary to comply with any other laws or regulations applicable to LICENSOR or LICENSEE.

14

## ARTICLE XIII - NOTICES

13.01 It will be a sufficient giving of any notice, request, report, statement, disclosure, or other communication hereunder, to LICENSOR or to LICENSEE, if the party giving it deposits a copy thereof in a post office in a registered or certified envelope, postage prepaid, or with overnight courier, prepaid, receipt requested, addressed to the other party at its address set forth below or at any other address the other party may hereafter designate in writing in accordance with the provisions hereof.  Unless otherwise specified in this Agreement or otherwise designated in writing, payments to be made pursuant to any of the provisions of this Agreement will be transmitted to the address to which notice is to be given hereunder, or wired to the bank account of LICENSOR as requested by LICENSOR.  The respective addresses for the parties are:

| | |
|---|---|
| If to LICENSEE: | International Shield, Inc.<br>3500 Willow Lake Boulevard, # 500<br>St. Paul, MN 55110<br><br>Attention:  President |
| If to LICENSOR: | TRISTRATA TECHNOLOGY INCORPORATED<br>1105 North Market Street<br>Suite 1300, P.O. Box 8985<br>Wilmington, Delaware 99899<br><br>Attention:  President |
| With a copy to: | TriStrata, Inc.<br>307 College Road East<br>Princeton, NJ  08540<br><br>Attention:  President |

Notice to LICENSEE shall be deemed notice to each Affiliate of LICENSEE for all purposes, and LICENSOR shall not be required to give any separate notice to any Affiliate of LICENSEE.

15

## ARTICLE XIV - APPLICABLE LAW AND JURISDICTION

14.01 All matters affecting the interpretation validity and performance of this Agreement shall be governed by the laws of the State of Delaware without regard to its conflict of law principles.

14.02 The United States District Court for the District of Delaware, if a basis for Federal court jurisdiction is present, and otherwise a state court of the State of Delaware, shall have exclusive jurisdiction and venue over any dispute arising under or relating to this Agreement, and LICENSEE and the Affiliates of LICENSEE consent to the jurisdiction and venue of such courts. Each of LICENSOR and LICENSEE and Affiliates of LICENSEE submits to personal jurisdiction and venue in the State of Delaware in any action or proceeding arising under or relating to this Agreement and hereby agrees not to assert by way of pleading, motion or otherwise in any such suit, action or proceeding, that such party is not personally subject to the jurisdiction of any such court and such action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement may not be enforced in or by such court. In furtherance of such submission to jurisdiction, each of LICENSOR and LICENSEE and Affiliates of LICENSEE hereby agrees that, without in any manner limiting or restricting other methods of obtaining personal jurisdiction over such party, personal jurisdiction over LICENSOR or LICENSEE in any action or proceeding arising out of or relating to this Agreement may be obtained over such party within or without the jurisdiction of any court located in the State of Delaware (including a United States Federal District Court in such state) and that any process, notice of motion, or other application to any court in connection with any such action or proceeding may be served upon such party by registered or certified mail to, or by personal service upon such party at the last address of such party as specified in, or in accordance with the provisions of, Article XIII of this Agreement.

Each of the Affiliates of LICENSEE shall be bound by the provisions of this Section 14.02.

14.03 In any action commenced to enforce this Agreement or as a result of a breach of this Agreement, the prevailing party in such action shall be entitled to recover

16

the cost of such action, including attorneys' fees, incurred as a result of the action to enforce and/or remedy the breach of this Agreement.

## ARTICLE XV - MISCELLANEOUS

15.01 (a)    If any provision of this Agreement or the application of any provision of this agreement to any person or under any circumstance shall be held to be invalid, unenforceable or in conflict with the law of any jurisdiction, the validity and enforceability of the remaining provisions and the application thereof to any another person or under any other circumstance shall not be affected by such holding.

(b)    Any provision of this Agreement which is held to be invalid or unenforceable by a court of competent jurisdiction in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such invalidity or unenforceability.

15.02 The waiver by either party, whether express or implied, of any provision of this Agreement, or of any breach or default by the other party, shall not be construed to be a continuing waiver of such provision or of any succeeding breach or default, or a waiver of any other provision of this Agreement.

15.03 Nothing contained in this Agreement shall be construed to constitute or imply a joint venture, partnership, or principal-agent relationship between LICENSOR and LICENSEE. Neither party by virtue of this Agreement shall have any right, power or authority to act or create any obligation, express or implied, on behalf of the other party. Neither LICENSEE, nor any Affiliate of LICENSEE, nor any of the employees of LICENSEE or of any Affiliate of LICENSEE shall in any manner be deemed an employee or an agent of LICENSOR for any purpose whatsoever.

15.04 The provisions of this Agreement are solely for the benefit of LICENSOR and LICENSEE, their authorized Affiliates, and their permitted successors and assigns (as defined herein), and no such provision shall be construed or applied to confer any rights or benefits on any other person.

15.05 This Agreement may be simultaneously executed in several

17

counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.  Both parties hereto may sign the same counterpart or each party hereto may sign a separate counterpart of this Agreement.

15.06 Article, section and paragraph headings in this Agreement are for reference purposes only and shall not in any way affect the construction or interpretation of any provision of this Agreement.

15.07 Upon receipt of the payment referred to Paragraph 4.01(a) above and the execution and delivery of this Agreement by both parties, the parties will dismiss their respective claims and defenses to any claims asserted in the Delaware Litigation.

15.08 As further consideration for the license granted to LICENSEE hereunder, LICENSEE and LICENSOR shall conduct good faith discussions for a new product development agreement ("New Product Development Agreement") under which LICENSOR or an Affiliate, for fees payable to LICENSOR to be agreed on, would develop a new product(s) utilizing proprietary technology of LICENSOR. In the event LICENSOR and LICENSEE agree to go forward with new product development, there would be a separate New Product Development Agreement, the terms of which shall be negotiated separately by LICENSOR and LICENSEE.  Notwithstanding anything to the contrary herein, this Section 15.08 imposes no obligation on LICENSOR or LICENSEE to enter into a New Product Development Agreement or to conduct discussions concerning the same for any set period of time.  In the event that LICENSEE enters into a New Product Development Agreement and undertakes commercialization of one or more products pursuant thereto, LICENSOR agrees to hold good faith negotiations with LICENSEE to discuss an equitable reduction in the amount of minimum annual royalties payable pursuant to Section 4.01(c) of this Agreement in the event the new products developed by LICENSOR and commercialized by LICENSEE are based on technology other than the Licensed Patent Rights.

**[Signature Page Follows]**

18

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written above.

LICENSOR                                LICENSEE
TRISTRATA TECHNOLOGY, INC.              INTERNATIONAL SHIELD, INC.

By _Kenneth C. Yu_                      By _Z. ATTIA_

Title _President_                       Title _president_

Dated _October 24, 2005_                Dated _10/18/05_

Attest: _Meye Hy_                       Attest: _____

Int'l Shield TriStrata License agr 101705 execution copy

19

## SCHEDULE 2.02 - ISSUED PATENTS AND PATENT APPLICATIONS

1.      U.S. Patent Reex. No. B1 5,091,171

2.      U.S. Patent No. 5,385,938

3.      U.S. Patent No. 5,389,677

4.      U.S. Patent No. 5,422,370

5.      U.S. Patent No. 5,547,988

6.      U.S. Patent No. 5,554,597

7.      U.S. Patent No 5,554,652

8.      U.S. Patent No. 5,561,158

9.      U.S. Patent No. 5,654,336

10.     U.S. Patent No. 5,674,899

11.     U.S. Patent No. 5,691,378

12.     U.S. Patent No. 6,060,512

## PATENT APPLICATIONS

U.S. Serial No. 945,680

## SCHEDULE 2.06 – AFFILIATES OF LICENSEE

**None.**

ii

## SCHEDULE 3.03 - LICENSEE MARKS

1. Z. Bigatti

2. International Shield

## SCHEDULE 4.01(a) – AFFIDAVIT OF SALES

### AFFIDAVIT

STATE OF MINNESOTA          :
                            :
COUNTY OF HENNEPIN          :

Abdel Attia, hereby states that:

       1.    I am over eighteen (18) years of age and believe in the obligation of an oath.

       2.    I am the chief executive officer of International Shield, Inc.

       3.    I have reviewed the accounting records for International Shield Products and Section 4.01 of the license agreement to which this affidavit is attached. The statements concerning the sales amounts for Licensed Products for the dates set forth therein are true to the best of my knowledge, information and belief. The statement that the Deep Repair and Eye Return products do not contain and never did contain alpha hydroxyacids and/or contained alpha hydroxyacids in an amount less than .1% and only for use as a pH adjuster is also true.

_____
Abdel Attia

Sworn and subscribed to before me
this 18th day of October, 2005.

_____
NOTARY PUBLIC

KIMBERLY JO RABA
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

iv

# EXHIBIT 2

## PERSONAL GUARANTY

1. For valuable consideration and for the purpose of inducing TriStrata Technology, Inc. to enter into a certain License Agreement with an Effective Date of October 15, 2005 (hereinafter the "License Agreement")) with International Shield, Inc., the undersigned Abdel Attia, (referred to in this agreement as "Guarantor") personally guarantees absolutely and unconditionally the prompt and complete payment to TriStrata Technology, Inc. the payments required by Section 4.o1(a) of the License Agreement and also guarantee any costs of collection thereof including but not limited to all attorney fees and legal costs.

2. This is a continuing Guaranty and is in effect until all of the obligations of International Shield pursuant to Section 4.01(a) of the License Agreement are satisfied. The death, insolvency and/or bankruptcy of Guarantor or International Shield, Inc. will have no effect on this Guaranty.

3. Guarantor waives any and all Guaranty defenses, including but not limited to exoneration, all subrogation rights, the benefit of any applicable statute of limitations, any notice of default, presentment for payment, notice of non-payment, protest and notice of acceptance of this Guaranty.

4. This Guaranty shall be construed and enforced under Delaware state law. Guarantor and TriStrata Technology, Inc. irrevocably submit to the jurisdiction and venue of the state or federal courts in Wilmington, Delaware for any action or proceeding regarding this Guaranty.

5. If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties to this agreement shall be construed and enforced accordingly.

6. There are and shall be no conditions or limitations to this Guaranty except as may be agreed upon by the TriStrata Technology, Inc. and the Guarantor in a separate writing subsequent to this agreement.

**[Remainder of Page Intentionally Left Blank**

**Signature Page Follows]**

DATED this _18_ day of October, 2005.

I, Abdel Attia, have read, understand and agree to the above Guaranty.

[Signature]

_____
Abdel Attia

Before me appeared Abdel Attia
and know by me to be him, he did
affix his signature to this document.

NOTARY PUBLIC  10|18|05



KIMBERLY JO RABA
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TRISTRATA TECHNOLOGY, INC.                )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )      Civil Action No. 06-496
                                          )
INTERNATIONAL SHIELD, INC., and ABDEL     )
ATTIA                                     )
                                          )
            Defendants.                   )

## DECLARATION OF BRIAN T. FOLEY PURSUANT TO 28 U.S.C. § 1746

I, Brian T. Foley, being first duly sworn, deposes and states under oath and under penalty
of perjury as follows:

1.      My name is Brian T. Foley and I am a partner at the law firm of McGovern &
Associates, based in New York, New York.  I have served as outside licensing counsel for
Plaintiff TriStrata Technology, Inc. ("TTI") for approximately twelve (12) years.  I was
personally involved in the prior patent litigation between TTI and International Shield, as well as
the negotiation and performance of each of the agreements at issue in this lawsuit.

2.      I am submitting this Declaration in support of TTI's Motion for Summary
Judgment, and I have personal knowledge of the facts set forth herein.

3.      On September 14, 2004, TTI brought a patent infringement suit in this Court
against International Shield and other parties, Tristrata Technology, Inc. v. Beauty Underneath,
et al., Civil Action No. 04-1263 (JJF), for infringement of various patents owned by TTI relating
to the use of alpha-hydroxy acids to treat wrinkles and other skin conditions (the "Prior Action").

4.      After more than a year of litigation, on or about October 15, 2005, TTI and
International Shield, Inc. ("International Shield") entered into a license agreement (the "License

Agreement") which settled the Prior Action and granted a license to International Shield to sell certain skin products under TTI's patents, provided that International Shield make payments to TTI for past and future sales of the licensed products. Mr. Attia is the signatory on this agreement.

     5. Mr. Attia also signed an "Affidavit of Sales" in support of the License Agreement stating that he is over eighteen years of age, is the chief executive officer of International Shield, and that he has reviewed both the accounting records for International Shield's products and payment provisions of the License Agreement.

     6. ██████████████████████████████████████████

████████████████████████████████████████ Abdel Attia executed a personal guaranty agreement, also dated October 15, 2005 (the "Personal Guaranty"). █████████████████████████████████████

████████████████████████████████████████████

     7. International Shield made one modest up front payment of ████ when the License Agreement was signed, ████████████████████████████

████

     8. On February 28, 2006, International Shield informed TTI that it would be unable to meet its payment obligations ███████████████████████████████ ████████ (See Ex. A, e-mail from D. Schwiebert to B. Foley dated February 28, 2006).

     9. Rather than be found in default, Mr. Attia's attorney, Ronald Groth, proposed a forbearance agreement. (Id.) The purpose of the forbearance agreement was to ██████████ ██████████████████████████████████████████████ ████████████████████████████

10.    The forbearance agreement, dated March 1, 2006, provided that International Shield was to pay TTI on or before May 1, 2006: the remaining balance for past sales ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮d ▮▮▮▮▮▮▮ (the "Forbearance Agreement").  These terms were proposed by Mr. Groth, legal counsel for International Shield, and Mr. Attia.

11.    The first draft of the Forbearance Agreement was prepared by Mr. Groth and at no time did he indicate that Mr. Attia was suffering from duress, mental incapacity or was otherwise incapable of performing under agreement. ▮▮▮▮▮▮▮▮▮▮▮



12.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮

13.    International Shield and Mr. Attia, through its legal counsel Mr. Groth, asked for an additional 60 days to pay the amounts due, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮

14.    TTI agreed to an extension of the Forbearance Agreement, dated May 1, 2006, which required International Shield to pay all amounts due by June 29, 2006, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (the "Extension to Forbearance Agreement").  (See Ex. B, e-mail from B. Foley to R. Groth dated May 1, 2006).

15.    As with the original Forbearance Agreement, Mr. Groth also drafted the Extension to Forbearance Agreement and gave no indication that Mr. Attia was suffering from any duress or mental incapacity at the time.

16.    International Shield failed to make any of the required payments by the June 29, 2006 deadline.

17.    I attempted to follow up with Mr. Attia's attorneys concerning the default, but received no response. After several attempts, I sent an e-mail to Mr. Groth on July 17, 2006, informing him that because of his failure to respond TTI had no other choice but to enforce its rights against International Shield and against Mr. Attia under the Personal Guaranty. (See. Ex. C, e-mail from B. Foley to R. Groth dated July 17, 2006).

18.    On July 21, 2006, I sent a letter to International Shield (addressed to Mr. Attia's attention) stating that the payment obligations had not been satisfied. My letter further advised Defendants that TTI would "take the necessary steps to recover all amounts due TTI from International Shield and/or Mr. Abdel Attia pursuant to the personal guaranty" and that, as a result of Defendants' default, International Shield was no longer licensed under the agreements. (See Ex. D, letter from B. Foley to International Shield letter dated July 21, 2006).

19.    TTI filed this lawsuit on August 10, 2006, seeking payment from International Shield and/or Mr. Attia of all due and owing amounts plus interest, costs and attorney's fees. TTI withheld formal service, but sent courtesy copies to Defendants' counsel via e-mail on August 11, 2006. (See Ex. E, e-mail from B. Foley to R. Groth dated August 11, 2006). TTI withheld service to allow Defendants a final chance to satisfy its payment obligations before having to pursuing litigation. After formal service was made, TTI agreed, at Defendants' request, to an extension of time for Defendants to file their answer.

20.    At no time during the negotiation or performance of the relevant agreements did Mr. Attia (or his attorneys) indicate to TTI (or its attorneys) that he was under duress, lacked the mental capacity or was otherwise incapable of entering into or performing under the agreements.

21.    Mr. Attia is the president of a company that has sold millions of dollars worth of cosmetic products.

22.    Mr. Attia, on behalf of his company, participated in litigation with TTI for over a year and sat for a two-day deposition conducted by TTI's lawyers. I was present at the entire deposition and recall no instance when Mr. Attia appeared to be suffering from any duress or incapacity (and the transcript reveals none either). Mr. Attia answered questions cogently and displayed no indication that he was incapable of understanding the situation. In fact, during a break in the deposition, Mr. Attia asked TTI's counsel if the case could be settled.

23.    To date, apart from International Shield's initial payment of ▮▮▮▮▮ none of the remaining amounts have been paid by International Shield (or by Mr. Attia as guarantor) under the License Agreement and subsequent forbearance agreements.

24.    I declare under penalty of perjury that the foregoing is true and correct and I executed this declaration on October 2, 2006.

Brian T. Foley

# EXHIBIT A

**From:** Schwiebert, Darren
**To:** 'Brian T. Foley'
**Sent:** Tuesday, February 28, 2006 4:39 PM
**Subject:** FW: Tristrata Settlement

Brian:

See the attached e-mail. I became aware of this for the first time today. Please confirm by e-mail that you will keep the contents of the e-mail confidential.
If you would like me to arrange a conference call with Mr. Groth, please let me know.

Darren

-----Original Message-----
**From:** Ronald H. Groth, Esq. [mailto:rhg@suite2960.com]
**Sent:** Tuesday, February 28, 2006 2:34 PM
**To:** Schwiebert, Darren
**Subject:** TriStrata Settlement

Darren:





Ron

Ronald H. Groth, Esq.
Groth Law Firm, Ltd.
Suite 2960
222 South 9th Street
Minneapolis, MN  55402-3302
(612) 215-3303
Fax: (612) 349-6210
E-Mail: rhg@suite2960.com

# EXHIBIT B

**From:** Brian T. Foley
**To:** 'Groth, Ronald H.'
**Cc:** Darren Schwiebert
**Sent:** Monday, May 01, 2006 9:29 AM
**Subject:** TriStrata Notice of Default

**PRIVILEGED & CONFIDENTIAL**
**FOR SETTLEMENT PURPOSES**

Dear Ron:



If International Shield is willing to accept the following terms, please prepare a simple draft amendment for my review so we can execute it before the termination of the license becomes effective.



Please let me know if the above is acceptable to your client.

Sincerely,

Brian T. Foley

-------------------------------------------------------
This is an electronic mail from McGovern & Associates.
Its contents are confidential and legally privileged to the
ordinary user of the electronic mail address to which it is
addressed. No one else may copy or forward any part of
it. If the reader of this electronic mail is not the intended
recipient, you are hereby notified that any dissemination,
distribution or copy of this electronic mail is strictly
prohibited. Our postal address is 545 Madison Avenue,
15th Floor, New York 10022 at which address a list of
our attorneys may be inspected. If you receive this
electronic mail in error we would be grateful if you would
electronic mail us at Bfoley@mcgovernlaw.com or
telephone us at (212) 688-9840 or fax at
(212) 688-9844. Thank you.

# EXHIBIT C

**From:** Brian T. Foley
**To:** 'Groth, Ronald H.'
**Cc:** Warnecke, Michael O.
**Sent:** Monday, July 17, 2006 10:43 AM
**Subject:** International Shield

Dear Ron:

Because we have not heard from you regarding the above matter, we will have no choice other than to recommend to our client that it should proceed to avail itself of the personal guaranty and enforce it rights. Accordingly, TriStrata's lead trial counsel is copied on this email.

My client has been more than accommodating to your client and the absence of communication is very disturbing.

Best regards,

Brian

-------------------------------------------------------

This is an electronic mail from McGovern & Associates. Its contents are confidential and legally privileged to the ordinary user of the electronic mail address to which it is addressed. No one else may copy or forward any part of it. If the reader of this electronic mail is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this electronic mail is strictly prohibited. Our postal address is 545 Madison Avenue, 15th Floor, New York 10022 at which address a list of our attorneys may be inspected. If you receive this electronic mail in error we would be grateful if you would electronic mail us at Bfoley@mcgovernlaw.com or telephone us at (212) 688-9840 or fax at (212) 688-9844. Thank you.

# EXHIBIT D

# McGOVERN & ASSOCIATES
## Attorneys and Counselors at Law
545 Madison Avenue, 15th Floor
New York, New York 10022
(212) 688-9840
Fax: (212) 688-9844
www.mcgovernlaw.com

Connecticut Office
16 Round Hill Road
Greenwich, CT 06831
(203) 622-1101
Fax (203) 622-9192

Brian T. Foley
bfoley@mcgovernlaw.com

July 21, 2006

**Via Overnight Courier,**
**Delivery Receipt Requested**

International Shield, Inc.
Attention: Abdel Attia, President
3500 Willow Lake Boulevard, # 500
St. Paul, MN 55110

Re:    **Default of Obligations Pursuant to Forbearance Agreement**
**and Extension to Forbearance Agreement**

Dear Sir:

Please be advised that despite recent and repeated requests to contact your counsel, the obligations pursuant to the Forbearance Agreement with an Effective Date of March 1, 2006 and the Extension to Forbearance Agreement with an Effective Date of May 1, 2006 have not been satisfied. Accordingly, TriStrata Technology, Inc. ("TTI") has instructed us to take the necessary steps to recover all amounts due to TTI from International Shield, Inc. and/or Mr. Abdel Attia pursuant to the personal guaranty.

You are hereby notified that, absent express written reinstatement by TTI of the License Agreement with an effective date of October 15, 2005, International Shield, Inc. is no longer licensed under said agreement as a result of the default of its obligations pursuant to the License Agreement, the Forbearance Agreement and the Extension to Forbearance Agreement.

Sincerely,

Brian T. Foley

cc:    TriStrata Technology, Inc.
Ronald Groth, Esq. (Via Facsimile and U.S. Mail)
Mayer, Brown, Rowe & Maw (Via Facsimile and U.S. Mail)

Int'l Shield Notice 071906

# EXHIBIT E

**From:** Brian T. Foley
**To:** 'Groth, Ronald H.'
**Sent:** Friday, August 11, 2006 8:36 AM
**Subject:** TriStrata

Dear Ron:

As promised, I am getting back to you to let you know informally my client's decision and next steps given International Shield's default on the license and forbearance agreement.

TriStrata certainly went the extra miles in an effort to assist International Shield and Mr. Attia, it unfortunately reached a point with so little concrete movement towards an acquisition or improvement in International Shield's financial position that we were constrained to seek formal legal redress to protect TriStrata's interests.  Accordingly, attached are courtesy copies of the papers filed in the U.S. District Court in Delaware.

My client, however, is always open to discussing any reasonable proposal your client may have to pay the past due amounts on the license and forbearance agreements and a reinstitution of the license agreement if such terms can be worked out.  I also appreciate the candor with which you have communicated with me during this process.

Please feel free to give me a call today at your convenience so we can discuss the matter further if you wish.

Best regards,

Brian

------------------------------------------------------
This is an electronic mail from McGovern & Associates. Its contents are confidential and legally privileged to the ordinary user of the electronic mail address to which it is addressed. No one else may copy or forward any part of it. If the reader of this electronic mail is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this electronic mail is strictly prohibited. Our postal address is 545 Madison Avenue, 15th Floor, New York 10022 at which address a list of our attorneys may be inspected. If you receive this electronic mail in error we would be grateful if you would electronic mail us at Bfoley@mcgovernlaw.com or telephone us at (212) 688-9840 or fax at (212) 688-9844. Thank you.

# EXHIBIT 4

MAR 20 2006 3:42    L  H LAW FIRM, LTD.    6123﹍﹍3210    P.2
MAR-20-2006 MON 03:53 PM Z. BIGATTI    FAX NO. 6515585885    P. 01

# FORBEARANCE AGREEMENT

**AGREEMENT,** made effective March 1, 2006, by and between **TRISTRATA TECHNOLOGY, INC.,** a Delaware corporation having its principal place of business at 1105 North Market Street, Suite 1300, P. O. Box 8985, Wilmington, Delaware 19899 (hereinafter referred to as "Licensor") and **INTERNATIONAL SHIELD, INC.,** a Minnesota corporation having a principal place of business at 3500 Willow Lake Boulevard, Suite 500, St. Paul, Minnesota 55110 (hereinafter referred to as "Licensee").

## RECITALS:

**A.**    The parties entered into a License Agreement effective October 15, 2005 (the "License Agreement"); and

**B.**    Licensee informed Licensor that it was unable to pay the initial amount due for past royalties pursuant to Article IV of the License Agreement on February 28, 2006, of ▓▓▓▓▓▓▓▓; and

**C.**    Without waiving any rights granted to LICENSOR by the License Agreement and/or the personal guaranty executed by Abdel Attia, the parties desire to modify the payment terms of the License Agreement by this written instrument.

**NOW THEREFORE,** in consideration of the foregoing Recitals, the mutual covenants and promises made herein, Licensor and Licensee hereby agree as follows:

1.    **Payment Terms.** On or before May 1, 2006, Licensee shall pay Licensor the sum of ▓▓▓▓▓▓ as and for the payments that were due pursuant to Article 4.01(a) of the License Agreement on February 28, 2006 and to come due on September 30, 2006. Additionally, Licensee shall pay Licensor on or before May 1, 2006, a forbearance fee of ▓▓▓▓ as consideration for Licensor extending Licensee the time to make the payment due under the License Agreement. ▓▓▓▓▓▓ Licensor shall refrain from issuing a Notice of Default pursuant to Sections 7.01 and 13.01 of the License Agreement until April 17, 2006 at which time the Notice of Default shall be given by Licensor to Licensee, *unless* Licensee has fully complied with the terms and provisions of this Forbearance Agreement and is otherwise not in default of the License Agreement.



P.1    6123498210    GROTH LAW FIRM, LTD.    11:51 9002 02 JAM

Mar 20 2006 3:42        GROTH LAW FIRM, LTD.        6123496210        P.3
MAR-20-2006 MON 03:53 PM Z. BIGATTI              FAX NO. 6515586665        P. 02



5.    No Modification of Prior Agreement.    Except as is expressly set forth above, all other terms of the License Agreement shall remain in full force and effect. This modification shall in no manner relieve Abdel Attia of his obligations under the Guaranty of the License Agreement.

LICENSOR:                          LICENSEE:

TRISTRATA TECHNOLOGY, INC.         INTERNATIONAL SHIELD, INC.

By _____       By _____

Title: President                   Title: President

Dated: March 20, 2006              Dated: 3/20/06

Attest: _____      Attest: _____

Mar 20 2006 3:42    G.  H LAW FIRM, LTD.        6123486210              p.4
MAR-20-2006 MON 03:54 PM Z. BIGATTI          FAX NO. 6515585865         P. 03

DATED this ____ day of March, 2006.

I, Abdel Attia, have read, understand, and agree to the above Modification Agreement.

_____
Abdel Attia

Before me appeared Abdel Attia and known by me to be him, he did affix his signature to this document.

_____
Notary Public            __/__/__

3

# EXHIBIT 5

# EXTENSION TO FORBEARANCE AGREEMENT

**AGREEMENT**, made effective May 1, 2006, by and between **TRISTRATA TECHNOLOGY, INC.**, a Delaware corporation having its principal place of business at 1105 North Market Street, Suite 1300, P. O. Box 8985, Wilmington, Delaware 19899 (hereinafter referred to as "Licensor") and **INTERNATIONAL SHIELD, INC.**, a Minnesota corporation having a principal place of business at 3500 Willow Lake Boulevard, Suite 500, St. Paul, Minnesota 55110 (hereinafter referred to as "Licensee").

## RECITALS:

**A.**    Licensor and Licensee entered into a Forbearance Agreement effective March 1, 2006; and

**B.**    Licensee has requested that Licensor extend the due date on the amounts due pursuant to that Forbearance Agreement from May 1, 2006 until June 29, 2006; and

**C.**    Without waiving any rights granted to Licensor by the License Agreement and/or the personal guaranty executed by Abdel Attia or the Forbearance Agreement, the parties desire to modify the Forbearance Agreement by this written instrument.

**NOW THEREFORE,** in consideration of the foregoing Recitals, the mutual covenants and promises made herein, Licensor and Licensee hereby agree as follows:

1.    <u>**Extension of Payment Obligation**</u>.    All amounts due pursuant to Paragraph 1 of the Forbearance Agreement shall become due and payable on June 29, 2006.    All other provisions of Paragraph 1 of the Forbearance Agreement shall remain in effect.

3.    <u>Acknowledgement and Waiver</u>.    Licensee hereby acknowledges receipt of a Notice of Default by Licensor dated April 18, 2006.    Licensee further waives all defenses to Licensor's claims if the payments are not made by June 29, 2006.

4.    <u>No Modification of Prior Agreements</u>. Except as expressly set forth above, all the other terms of the License Agreement and Forbearance Agreement shall remain in full force and effect. This modification shall in no way relieve Abdel Attia of his obligations under the Guaranty of the License Agreement.

LICENSOR:                                    LICENSEE:

TRISTRATA TECHNOLOGY, INC.                   INTERNATIONAL SHIELD, INC.

By _____                   By _____

Title: _____President_____                    Title: _____CEO_____

Dated: ___May 5, 2006___                      Dated: ___5/9/06___

Attest: _____                       Attest: ___Ronld HGroth___

DATED this ___9th___ day of May, 2006.

I, Abdel Attia, have read, understand, and agree to the above Extension of Forbearance Agreement.

_____
            Abdel Attia

Before me appeared Abdel Attia and known by me to be him, he did affix his signature to this document.

_____
Notary Public                    / /

RONALD H GROTH
Notary Public
Minnesota
My Commission Expires January 31, 2010

2

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRISTRATA TECHNOLOGY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-496 (JJF) |
| | ) | |
| INTERNATIONAL SHIELD, INC., and | ) | |
| ABDEL ATTIA | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF MOLLY SHERLOCK PURSUANT TO 28 U.S.C. § 1746

I, Molly Sherlock, being first duly sworn, deposes and states under oath and under penalty of perjury as follows:

1.      My name is Molly Sherlock and I am a paralegal at the law firm of Mayer, Brown, Rowe and Maw LLP in Chicago.

2.      I am submitting this Declaration in support of TTI's Motion for Summary Judgment, and I have personal knowledge of the facts set forth herein.

3.      On October 4, 2006, I accessed Defendants' website at <zbigatti.com> and printed out several screenshots from the product web pages. The printouts are attached hereto as Exhibit A.

4.      I declare under penalty of perjury that the foregoing is true and correct and I executed this declaration on October 5, 2006.

*Molly Sherlock*
Molly Sherlock

13333919

# EXHIBIT A

Z.bigatti Cosmetics



HOME  NEWS  PRODUCTS  STORES  ABOUT US  CONTACT US    QUICK SHOP  CHECK OUT

**MY ACCOUNT**

REGISTER

**SHOPPING BASKET**

SHIPPING INFORMATION

3 MINUTE CONSULTATION

EVENT CALENDAR

**TERMS AND CONDITIONS**

**PRIVACY POLICY**



© 2003-4 Z.Bigatti all rights reserved | site developed by Artropolis - Minneapolis web design

Z.Bigatti Age-Defying

Page 1 of 1



HOME  NEWS  PRODUCTS  STORES  ABOUT US  CONTACT US

 QUICK SHOP  CHECK OUT

PRETREATMENTS   DAILY MOISTURIZERS   SENSITIVE SKIN   AGE-DEFYING   MASKS   SPECIALIZED TREATMENTS

**PRODUCTS** Age-Defying

1  2  3  >  of 3 pages

**MY ACCOUNT**

REGISTER

**SHOPPING BASKET**

SHIPPING INFORMATION

3 MINUTE CONSULTATION

EVENT CALENDAR

**TERMS AND CONDITIONS**

**PRIVACY POLICY**



**Re-Storation Skin Treatment**
$155.00 US - 2 oz.
The original 'all-in-one' luxury
anti-aging cream.



**Deep Repair Facial Serum**
*Intensive Anti-aging*
$198.00 US - 1 oz.
Tone, firm & eliminate visible
fine lines.



**Eye Return**
*Anti-aging Eye Cream*
$125.00 US - .5 oz.
Reduce puffiness and smooth
fine lines & wrinkles.



**Goodnight**
*Night Facial Cream*
$295.00 US - 2 oz.
Deeply moisturize & firm skin
while you sleep.

1  2  3  >  of 3 pages

© 2003-4 Z.Bigatti® all rights reserved | site developed by Artropolis - Minneapolis web design



Z.Bigatti Age-Defying



HOME  NEWS  PRODUCTS  STORES  ABOUT US  CONTACT US      QUICK SHOP  CHECK OUT

PRETREATMENTS  DAILY MOISTURIZERS  SENSITIVE SKIN     MASKS  SPECIALIZED TREATMENTS

**PRODUCTS** Age-Defying

< 1 **2** 3 > of 3 pages

MY ACCOUNT

REGISTER

**SHOPPING BASKET**

SHIPPING INFORMATION

3 MINUTE CONSULTATION

EVENT CALENDAR

**TERMS AND CONDITIONS**

PRIVACY POLICY



**Inception**
*total face masque*
$149.00 US - 3 Per Box
The most effective at-home
facial spa treatment.



**Re-Storation Skin Treatment**
*body lotion*
$98.00 US - 6.6 oz.
Luxurious, age-defying care for
the body.



**Impact**
*Fruit Enzyme Facial Mask*
$129.00 US - 2 oz.
Improve texture, tone, and
clarity in 3 minutes.



**Illuminate**
*Exfoliating & Firming Facial
Cream*
$175.00 US - 2 oz.
Radiant, yonger-looking skin
without AHAs.

< 1 **2** 3 > of 3 pages

© 2003-4 Z.Bigatti™ all rights reserved | site developed by Artropolis - Minneapolis web design

Z.Bigatti Age-Defying                                                                    Page 1 of 1

  HOME  NEWS  PRODUCTS  STORES  ABOUT US  CONTACT US      QUICK SHOP  CHECK OUT

PRETREATMENTS   DAILY MOISTURIZERS   SENSITIVE SKIN   AGE-DEFYING   MASKS   SPECIALIZED TREATMENTS

**PRODUCTS** Age-Defying

< 1 2 **3** of 3 pages

**MY ACCOUNT**

REGISTER

**SHOPPING BASKET**

SHIPPING INFORMATION

3 MINUTE CONSULTATION

EVENT CALENDAR

**TERMS AND CONDITIONS**

PRIVACY POLICY


**Prelude Starter Kit**
$195.00 US
Try four essential Z.Bigatti products!


**Lip Pout**
*Lip Treatment Cream*
$55.00 US - .17 oz.
Plump & hydrate lips, smooth vertical lip lines.


**Re-Storation Skin Treatment Facial Lotion**
$155.00 US - 2 oz.
A lighter version of the original 'all-in-one'.


**Swan**
*Firming Neck Treatment*
$141.00 US - 2 oz.
Restore skin elasticity & diminish signs of aging.

< 1 2 **3** of 3 pages

© 2003-4 Z.Bigatti™ all rights reserved | site developed by Artropolis - Minneapolis web design